2008 UT 70

**Michael K. OMAN, Plaintiff and Appellant,**

v.

**DAVIS SCHOOL DISTRICT, a political subdivision of the state of Utah; Dr. Darrell K. White, an individual; Lynn Trenbeath, an individual; Gary Payne, an individual; John Swain, an individual; Mel Miles, an individual; Leon Webster, an individual; and Dale May, an individual, Defendants and Appellees.**

No. 20061032.

Supreme Court of Utah.

Oct. 3, 2008.

&#9919;63(1)

Vincent C. Rampton, Salt Lake City, for appellant.

Mark L. Shurtleff, Att'y Gen., Glen E. Davies, Asst. Att'y Gen., Salt Lake City, for appellees.

PARRISH, Justice:

## INTRODUCTION

¶ 1 Michael Oman was an employee of Davis County School District (the "District") until 2003, when he was fired. Oman subsequently filed suit against the District and seven District employees (collectively, "Defendants"), claiming breach of contract, breach of the implied covenant of good faith and fair dealing, defamation, intentional infliction of emotional distress, and violation of the Utah Orderly School Termination Procedures Act ("UOSTPA"). Oman appeals the district court's decision in its entirety. The Defendants moved for summary judgment on all claims, which the district court granted. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶ 2 Oman began working for the District in 1982 as a maintenance electrician and was assigned to various positions before becoming a maintenance coordinator in 1998. After becoming a maintenance coordinator, Oman no longer personally performed maintenance work, but acted in a supervisory role to assure that others carried out their work assignments. Oman supervised the work of three foremen who performed or supervised performance of maintenance work on the District's physical facilities. Much of Oman's

work was performed by phone; actual site visits accounted for only about ten percent of his time.

¶ 3 Oman's employment as a maintenance coordinator was governed by the terms and conditions set out in the 9CA Classified Employees' Agreement (the "Classified Agreement"). As a maintenance coordinator, Oman became an exempt employee under the Fair Labor Standards Act, which meant he received a salary instead of an hourly wage. During his tenure as a maintenance coordinator, Oman unilaterally decided that he was a "first responder," on duty "24/7." Oman kept his cell phone with him to respond to calls "on an as-needed basis." About two years after becoming a maintenance coordinator, he ceased tracking compensation time [1] as he had previously done.

¶ 4 In addition to his job with the District, Oman operated his own electrical contracting business. No policy existed that prevented District employees from having outside employment. However, at some point, Oman's supervisors began receiving reports from District employees that Oman was performing personal work for his contracting business during the District's normal work hours. In particular, Leon Webster, Oman's subordinate, complained that Oman was away from work during District work hours, that he could not reach Oman by cell phone on a regular basis, and that Oman was not doing his job, resulting in Webster having to do more work.

¶ 5 Gary Payne, the District's administrator of facilities management and planning, passed the complaints along to Lynn Trenbeath, the District's assistant superintendent. Trenbeath decided that an internal investigation would be appropriate and asked Dale May, the District's security officer, to find someone to conduct one. May contacted Officer Joe Morrison of the Layton City Police Department, an acquaintance of May's, and asked Officer Morrison if he would be willing to conduct the investigation on his personal time. Shortly thereafter, Layton City Police Chief Terry Keefe contacted Trenbeath and offered to take over the investigation as an official police matter. The District agreed and cooperated in the police investigation. May wrote a letter to the police department on March 21, 2002, which detailed some of the reports about Oman that provided a basis for the investigation: his absence from work, difficulty contacting him by cell phone, and other similar circumstances.

¶ 6 Officer Morrison conducted a police investigation of Oman's conduct in his official police capacity. The District authorized the placement of a GPS tracking device on Oman's District vehicle so that his movements could be tracked. For almost two months, Morrison used the tracking device to follow the vehicle's location. Morrison also personally followed Oman on several days during that period. All of this was done without Oman's knowledge.

¶ 7 The investigation revealed that on most days, Oman left work early to go home. The tracking device also recorded that Oman had used his District vehicle to visit job sites unrelated to District projects. Additionally, Officer Morrison observed Oman in his personal vehicle at personal job sites during the District's normal work hours. The police department turned over the results of the investigation to the Davis County Attorney's Office, which filed charges against Oman for communications fraud under Utah Code section 76–10–1801.

¶ 8 Based on the results of the investigation, the District suspended Oman on June 27, 2002 and offered to meet with him the next day to discuss the situation. Oman declined to participate in the meeting, choosing to first engage an attorney. On July 2, 2002, the District notified Oman that his suspension would be without pay. Oman hired an attorney and demanded a hearing with the District. A preliminary conference was held on August 16, 2002. The District then reaffirmed Oman's suspension without pay, and Oman requested a formal hearing.

1. Under the Classified Agreement, exempt employees were not paid extra for any hours worked over the standard forty hours per week. Exempt employees were compensated for overtime hours worked by receiving hour-for-hour compensatory time off for the amount of overtime worked.

That hearing was scheduled, but never occurred.[2]

¶ 9 Meanwhile, the criminal charges against Oman proceeded and a preliminary hearing was held on November 4, 2002. At the conclusion of the evidence, Oman was bound over for trial. On December 5, 2002, as a result of a plea agreement between Oman and the Davis County Attorney's Office, Oman pleaded no contest to the charge of attempted communications fraud, a class A misdemeanor.

¶ 10 On March 11, 2003, the District sent Oman a letter stating that his employment was terminated for cause, effective fifteen days from the date of the letter. The letter detailed the facts upon which the District based its decision to terminate, including the hours that Oman's District vehicle was tracked away from the District, times that Morrison followed Oman to his personal work sites, examples of Oman's misuse of his District vehicle, falsification of time cards, and neglect of professional obligations in violation of the Classified Agreement.

¶ 11 In 2004, Oman filed suit in the Federal District Court for the District of Utah against the District and seven District employees (the "District Employees") individually: Lynn Trenbeath; Gary Payne; Leon Webster; Dale May; Dr. Darrell K. White, the District's superintendent; John Swain, the District's director of environmental maintenance services; and Mel Miles, the District's human resources director. Oman's complaint included a claim under 42 U.S.C. § 1983 and five state law claims: breach of contract, breach of the implied covenant of good faith and fair dealing, intentional infliction of emotional distress, defamation, and violation of UOSTPA. The federal district court granted summary judgment for the Defendants on the § 1983 claim and dismissed the state law claims without prejudice.

¶ 12 In 2005, Oman filed a complaint in state district court, alleging the same five state causes of action that had been dismissed without prejudice by the federal court. The Defendants subsequently moved for summary judgment on all of Oman's claims. The district court granted the motion, thereby dismissing Oman's complaint.

¶ 13 Oman appeals the district court's decision in its entirety, raising multiple issues for review. We address each of these issues below and conclude that the district court properly granted the Defendants' motion for summary judgment. We therefore affirm the district court's decision.

## STANDARD OF REVIEW

¶ 14 " '[S]ummary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.' " *Swan Creek Vill. Homeowners Ass'n v. Warne*, 2006 UT 22, ¶ 16, 134 P.3d 1122 (quoting *Norman v. Arnold*, 2002 UT 81, ¶ 15, 57 P.3d 997). "A district court's decision to grant summary judgment is reviewed for correctness, with no deference afforded to the district court." *Pearce v. Utah Athletic Found.*, 2008 UT 13, ¶ 13, 179 P.3d 760.

## ANALYSIS

I. THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT IN FAVOR OF THE SCHOOL DISTRICT ON OMAN'S BREACH OF CONTRACT CLAIM

### A. Procedural History: Federal Court Action

¶ 15 Oman originally filed suit in the United States District Court for the District of Utah, seeking recovery under 42 U.S.C. § 1983. Oman also brought five state law claims pursuant to the federal court's supplemental jurisdiction, including a breach of contract claim. In 2005, the federal court granted summary judgment to the District on Oman's § 1983 claim. As part of its summary judgment order, the federal court made several findings and conclusions re-

---

2. In a subsequent agreement between Oman and the District, Oman withdrew his request for a hearing and waived any claim, including a denial of due process claim, based on the District's failure to provide a hearing. In return, the District waived any defense that Oman failed to exhaust his administrative remedies.

garding the Classified Agreement, including the following:

> During the two months that Morrison conducted surveillance on Plaintiff, he continued to turn in time cards reporting eight hours worked on District business each day, even though most of his days were spent at work sites for his own personal contracting business. It is disingenuous for Plaintiff to argue that as long as he had his cell phone with him, he was still working for the District. *Plaintiff's representations to the District regarding his work hours provided a sufficient basis for termination for cause.* (Emphasis added.)

¶ 16 Having disposed of the § 1983 claim over which it had subject matter jurisdiction, the federal district court declined to exercise supplemental jurisdiction over Oman's remaining state law claims and dismissed them without prejudice.

### B. Procedural History: State Court Action

¶ 17 Following the dismissal in the federal court, Oman filed an action in state court. In his complaint, Oman alleged the same five causes of action that had been dismissed without prejudice by the federal court, including the breach of contract claim. The state district court granted summary judgment to the District on Oman's breach of contract claim, relying on two alternative bases. First, the court "independently looked at the issues" and found that Oman had been properly terminated for cause and that the District "was not contractually required to give any prior notice, opportunity to be heard, or progressive discipline to [Oman] prior to his termination." Second, the state district court noted that "the findings and conclusions [of the federal court] involve precisely the same issues as those raised in [Oman's] breach of contract [claim]." The district court thus concluded that under the doctrine of issue preclusion, it was bound by the federal court's determinations that Oman was properly terminated for

cause under the Classified Agreement and that Oman was not contractually entitled to the procedures he sought.[3]

¶ 18 On appeal, Oman argues that both conclusions were erroneous. We hold that a combination of the two theories on which the district court relied provides a sufficient basis on which to affirm the summary judgment.

### C. Analysis: Contractual Provisions

¶ 19 In his memorandum opposing summary judgment to the district court—and in his opening brief to this court—Oman argued that the District breached the Classified Agreement by failing to follow the procedures contained therein. We disagree and conclude that the district court was correct in holding that Oman's arguments failed, as a matter of law, based on the Classified Agreement.

¶ 20 Oman first argues that section 8.5.3(1) of the Classified Agreement required the District to notify him when his actions placed his continued employment at risk. Second, Oman argues that section 8.5.4(1) required the District to inform him that his continued employment was in question, inform him of the reasons, and give him an opportunity to correct the problems. Third, Oman argues that section 8.3 of the Classified Agreement required the District to conduct individual employee evaluations at least once annually. Oman asserts that he did not receive such evaluations and that an evaluation "would quickly have addressed and resolved" any problems associated with his activities.

¶ 21 On summary judgment, the district court reviewed Oman's claims and the Classified Agreement. It concluded that, as a matter of law, the Classified Agreement "provides for a dual track of termination: one for unsatisfactory conduct … and the second for cause." The court further concluded that "[t]ermination for cause under the Classified Agreement is sufficient

---

**3.** Issue preclusion was also one of the district court's alternative bases for granting summary judgment to the District on Oman's claim that the District violated UOSTPA. We find this conclusion to be erroneous because the federal court's order did not address the application of the Act to Oman's § 1983 claim. Thus, while we affirm the district court's grant of summary judgment on this claim, we do so on different grounds.

grounds, standing alone, for termination, and no prior notice or warning, or opportunity to correct the conduct[ ] is required to be afforded to the employee." Finally, the court determined that "[t]here exists no issue of material fact that [Oman] was properly terminated by [the District] for cause under the terms of the Classified Agreement, or that [the District] was not contractually required to give any prior notice, opportunity to be heard, or progressive discipline to [Oman] prior to his termination." Based on these determinations, the district court granted summary judgment in favor of the District on Oman's breach of contract claim. We affirm the district court's grant of summary judgment.

■ ¶ 22 If the terms of a contract are unambiguous, "the contract may be interpreted as a matter of law." *Green River Canal Co. v. Thayn*, 2003 UT 50, ¶ 17, 84 P.3d 1134 (internal quotation marks omitted). Like the district court, we find that the terms of the Classified Agreement are unambiguous and we therefore interpret them as a matter of law.

■ ¶ 23 We first address Oman's claim that he was entitled to notice when his actions placed his employment at risk. This claim is based on section 8.5.3(1) of the Classified Agreement. Oman's reliance on this section is misguided. Under the Classified Agreement, there are two "tracks" of termination. The first is termination for unsatisfactory action or conduct, which is addressed in section 8.5.3(1). The second is termination for cause, which is addressed in section 8.5.3(2). Oman was terminated for cause under section 8.5.3(2).[4] Accordingly, the procedures governing termination for unsatisfactory conduct contained in section 8.5.3(1) do not apply, and Oman was, therefore, not contractually entitled to them.

■ ¶ 24 We next address Oman's claim that he was entitled to notice and an opportunity to correct the problem. This claim is

based on section 8.5.4(1) of the Classified Agreement. Again, Oman's reliance is misplaced. Section 8.5.4(1) contains the notice requirements applicable when an employee's contract is not being renewed. These requirements do not apply to Oman because his termination was not due to the District's decision not to renew his contract; rather, he was terminated during his contract term. Accordingly, the notice provisions of section 8.5.4(2) apply. That section specifies the notification requirements when an employee is terminated during his contract term. Oman has not argued that the District failed to meet these notification requirements. Indeed, the record shows that the District met them.

■ ¶ 25 Finally, we address Oman's claim that he was entitled to performance evaluations under section 8.3 of the Classified Agreement. We agree with Oman that the terms of the Classified Agreement specify that the District should evaluate each permanent employee "at least once annually." Nevertheless, this requirement does not bear on Oman's termination. The evaluation requirements in section 8.3 are exclusive of the termination procedures in section 8.5. Thus, any failure of the District to give performance evaluations does not preclude the District from terminating an employee under the procedures contained in the Classified Agreement. The issue in this case is whether the District properly followed the termination procedures in the Classified Agreement when it fired Oman. Whether the District conducted performance evaluations of its employees has no bearing on the resolution of this issue.

¶ 26 We therefore hold that the district court properly interpreted the Classified Agreement. As a matter of law, the District was not contractually obligated to satisfy the procedural requirements that Oman argued were required thereunder.

---

4. We note that the District did initially elect to use some of the disciplinary procedures contained in section 8.5.3(1), such as placing Oman on suspension. However, the District ultimately concluded that Oman should be terminated for cause under section 8.5.3(2) and it was not pre-

cluded from doing so under the Classified Agreement. Indeed, section 8.5.3(1) specifically states that "[n]o disciplinary action shall prejudice the right of the District to proceed with termination for cause on the same set of facts which gave rise to the disciplinary action."

## D.  Analysis: Issue Preclusion

¶ 27 In his reply brief to this court, Oman raises, for the first time, an additional argument to support his claim that summary judgment was inappropriate on his breach of contract claim.  Oman contends that under any interpretation of the classified agreement, there was still a triable issue as to whether Oman's conduct was sufficient grounds for termination for cause.  We could disregard this argument because it was not presented to the district court during the summary judgment proceedings.  *See State v. Labrum,* 925 P.2d 937, 939 (Utah 1996) ("Issues not raised before the trial court are usually waived and cannot be raised on appeal.").  Nevertheless, we choose to address it, and we conclude that the issue was resolved by the federal district court and that the state district court was bound by the federal court's determination under the doctrine of issue preclusion.

¶ 28 "The doctrine of res judicata embraces two distinct theories: claim preclusion and issue preclusion."  *Buckner v. Kennard,* 2004 UT 78, ¶ 12, 99 P.3d 842.  This appeal raises only the latter principle of issue preclusion.[5]  Issue preclusion, which is also known as collateral estoppel, "prevents parties or their privies from relitigating facts and issues in the second suit that were fully litigated in the first suit."  *Id.* (internal quotation marks omitted).  The purposes of issue preclusion include "(1) preserving the integrity of the judicial system by preventing inconsistent judicial outcomes; (2) promoting judicial economy by preventing previously litigated issues from being relitigated; and (3) protecting litigants from harassment by vexatious litigation."  *Id.* ¶ 14.

¶ 29 Issue preclusion applies only when the following four elements are met:

(i) the party against whom issue preclusion is asserted must have been a party to or in privity with a party to the prior adjudication; (ii) the issue decided in the prior adjudication must be identical to the one presented in the instant action; (iii) the issue in the first action must have been completely, fully, and fairly litigated; and (iv) the first suit must have resulted in a final judgment on the merits.

*Collins v. Sandy City Bd. of Adjustment,* 2002 UT 77, ¶ 12, 52 P.3d 1267 (internal quotation marks omitted).

¶ 30 Oman argues that issue preclusion does not apply in this case.  Specifically, he argues that there was no final adjudication because the federal court dismissed his state law breach of contract claim "without prejudice."

¶ 31 In making this argument, Oman confuses issue preclusion with claim preclusion.  "[C]laim preclusion bars a party from prosecuting in a subsequent action a *claim* that has been fully litigated previously."  *Snyder v. Murray City Corp.,* 2003 UT 13, ¶ 34, 73 P.3d 325 (emphasis added)(internal quotation marks omitted).  "On the other hand, issue preclusion ... prevents parties or their privies from relitigating *facts and issues* in the second suit that were fully litigated in the first suit."  *Id.* ¶ 35 (emphasis added) (internal quotation marks omitted).  While claim preclusion corresponds to causes of action, issue preclusion corresponds to the facts and issues underlying causes of action.  And where two causes of action embody the

---

5. In *Massey v. Board of Trustees of the Ogden Area Community Action Committee, Inc.,* the Utah Court of Appeals was faced with an issue of first impression in Utah: whether to apply federal common law or Utah common law when deciding if a federal court's decision has preclusive effect on a subsequent state court proceeding. 2004 UT App 27, ¶¶ 6–7, 86 P.3d 120.  The court of appeals cited case law from across the country and "conclude[d] that the current majority and better-reasoned approach is to apply federal law."  *Id.* We have not yet had the opportunity to address the rule enunciated by the court of appeals and take this opportunity to express our agreement with the court of appeals' conclusion

that federal law applies.  Nevertheless, we apply Utah common law here for the following reasons: (1) because we have not adopted a rule until now, both parties based their arguments on Utah common law; (2) the legal analysis under Utah common law is virtually identical to that under federal common law; and (3) our ultimate conclusion would be the same regardless of whether we applied federal or state law.  *See Youren v. Tintic Sch. Dist.,* 2004 UT App 33, ¶ 2 n. 1, 86 P.3d 771; *see also Massey,* 2004 UT App 27, ¶ 7, 86 P.3d 120 ("[T]here will usually be no difference in outcome from applying Utah common law on res judicata.").

same dispositive issue, a prior determination of that issue in the context of one cause of action can have a preclusive effect in later litigation regarding the other cause of action. As we have previously held, issue preclusion "prevents the relitigation of issues that have been once litigated and determined in another action *even though the claims for relief in the two actions may be different.*" *Penrod v. Nu Creation Creme, Inc.*, 669 P.2d 873, 875 (Utah 1983) (emphasis added); *see also* Restatement (Second) of Judgments § 27 (1982) ("When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, *whether on the same or a different claim.*" (emphasis added)). That is precisely the situation in this case.

¶ 32 Underlying the § 1983 claim was the dispositive issue of whether the District breached the Classified Agreement when it fired Oman for cause. Indeed, when Oman filed his complaint in federal court, his basis for the § 1983 cause of action was twofold: (1) that the District's "pre-termination conduct deprived him of due process rights secured by the Fifth and Fourteenth Amendments to the United States Constitution," and (2) that the District's "decision to suspend, and later terminate, his employment violated the terms of the Classified Agreement." Thus, a resolution of the § 1983 *claim*, as framed by Oman, required the federal court to resolve the underlying *issue* of whether the District violated the Classified Agreement when it fired Oman. The issue was squarely before the federal court, was litigated by the parties, and was necessary to the court's final judgment on the § 1983 claim.[6] Accordingly, the federal court made findings and conclusions regarding the alleged breach of contract-including the previously quoted conclusion that the District had a sufficient basis for firing Oman for cause

under the Classified Agreement-and these findings and conclusions are binding in subsequent actions under the doctrine of issue preclusion.

¶ 33 Although Oman's breach of contract claim was not litigated in the federal court, it is based upon the same underlying issue that was resolved by the federal court: whether the District had a sufficient basis for terminating Oman for cause under the Classified Agreement. The state district court was therefore bound by the federal court's conclusion that "[Oman]'s representations to the District regarding his work hours provided a sufficient basis for termination for cause." Accordingly, even if Oman had argued to the district court that his conduct did not give the District a basis for terminating him for cause, the argument would have failed based on the federal court's prior ruling. We therefore hold that the district court properly granted summary judgment to the District on Oman's breach of contract claim.

## II. THE DISTRICT COURT CORRECTLY HELD THAT THE DISTRICT DID NOT VIOLATE THE UTAH ORDERLY SCHOOL TERMINATION PROCEDURES ACT

¶ 34 We next address whether the district court correctly held that the District did not violate UOSTPA, Utah Code Ann. §§ 53A-8-101 to-107 (2000 & Supp.2001).[7] We hold that the District did not violate UOSTPA and affirm the district court's grant of summary judgment.

¶ 35 "Under our rules of statutory construction, we look first to the statute's plain language to determine its meaning." *State v. Gallegos*, 2007 UT 81, ¶ 12, 171 P.3d 426 (internal quotation marks omitted). "Furthermore, the plain language of a statute is to be read as a whole, and its provisions interpreted in harmony with other pro-

---

6. Indeed, in an order denying Oman's motion to alter or amend judgment, the federal court noted that "the court's findings and conclusions relate only to those issues that were necessary to the determination of the federal ... claim as that issue was framed by the parties."

7. The legislature originally promulgated UOSTPA in 1973, *see* 1973 Utah Laws 288-91, and has amended it multiple times, most recently in 2007. *See* Utah Code Ann. §§ 53A-8-101 to-107 (2006 & Supp.2008). We construe UOSTPA as it was in 2002 when Oman was first suspended. At that time, the legislature had amended UOSTPA most recently in 2001.

visions in the same statute and with other statutes under the same and related chapters." *State v. Schofield*, 2002 UT 132, ¶ 8, 63 P.3d 667.

¶ 36 The section of UOSTPA at issue is section 53A–8–104 ("section 104"), entitled "Dismissal procedures." More specifically, the parties' dispute focuses on subsections (2), (3), (6), and (9) of section 104. Oman argues that the District violated UOSTPA by not following the requirements of subsections (2) and (3) when it terminated his employment. The District contends—and the district court agreed—that section 104 provides a "dual track" for termination. Under this dual track, an employee may be terminated for "unsatisfactory performance" or "for cause," and UOSTPA mandates different procedural requirements for the two tracks. Because the requirements of subsections (2) and (3) apply only to terminations for unsatisfactory performance, and because Oman was fired for cause and not for unsatisfactory performance, the District was not required to follow the requirements of subsections (2) and (3) when it terminated Oman's employment. We agree with the District's interpretation of the statute.

### A. The District Was Not Required to Follow the Procedural Requirements of Subsections (2) and (3)

¶ 37 Subsection (2) explicitly states that it applies only to terminations "for reasons of unsatisfactory performance." Utah Code Ann. § 53A–8–104(2)(a) (Supp.2001). Subsection (2) provides that if a school district intends to terminate an employee for unsatisfactory performance, "the unsatisfactory performance must be documented in at least two evaluations conducted at any time within the preceding three years." *Id.* It also provides that before a district can issue a "notice of intent not to renew or continue the employee's contract beyond the then-current school year," the district must give a career employee thirty days' notice that the employee's "continued employment is in question" and "the reasons for the anticipated nonrenewal or discontinuance." *Id.* § 53A–8–104(2)(b). The district must also "give the career employee an opportunity to

correct the problem" and "may grant the career employee assistance to correct the deficiencies." *Id.* § 53A–3–104(2)(c), (d).

¶ 38 Subsection (3) builds upon the procedures outlined in subsection (2). Subsection (3) provides that if the employee does not correct the problem and if the district still intends to not renew or to discontinue the employee's contract at the end of the school year, the district must issue a notice of intent—as referenced in subsection (2)(b)—at least thirty days prior to the end of the employee's contract term. *Id.* § 53A–3–104(3).

¶ 39 Thus, subsections (2) and (3) together provide the minimum procedures that a school district must follow when firing an employee for unsatisfactory performance and they do not apply when an employee is fired for cause. We make this determination based on the plain language of the statute, but we also note that the interpretation makes practical sense.

¶ 40 Under Oman's proposed interpretation, a school district could not fire an employee unless it followed the requirements of subsections (2) and (3), regardless of the reason for the termination. But the requirements of these subsections are clearly established for the purpose of providing an employee who is not satisfactorily performing his job with notice of his deficient performance, an opportunity to correct the deficiency, and the assistance of the district in providing training, instruction, or other means of helping the employee to correct the deficiency. *See id.* § 53A–3–104(2). These procedural safeguards and opportunities to improve performance would be inappropriate in situations in which an employee is being terminated for cause. For example, if an employee sexually assaulted a student, it would make no sense if the district could not terminate the employee without following the procedures in subsections (2) and (3), i.e., documenting similar behavior by the employee in two prior evaluations, giving notice to the employee that the sexual assault has jeopardized the employee's continued employment, and giving the employee an opportunity to correct the problem. We refuse to adopt such an interpretation. *See Tschaggeny v.*

*Milbank Ins. Co.*, 2007 UT 37, ¶ 28, 163 P.3d 615 ("It is well-settled that this court will not interpret a statute to embrace a result ... that is so absurd that it could not have been intended by the legislature.").

¶ 41 Accordingly, Oman's argument that the District was required to follow the requirements of subsections (2) and (3) fails as a matter of law because Oman was fired for cause.

### B. The District Properly Followed the Procedures Under Subsections (6) and (9)

¶ 42 Having determined that the District was not required to follow the requirements of subsections (2) and (3) because Oman was fired for cause, we now look to other subsections of section 104 to determine what requirements the District was required to follow when it terminated Oman.

¶ 43 Subsection (6) provides the procedural requirements that a district must follow if it "intends to not renew or discontinue the contract of a career employee or to terminate a career or provisional employee's contract during the contract term." Utah Code Ann. § 53A–8–104(6). By its plain language, subsection (6) applies to any termination, whether it is termination for unsatisfactory performance or termination for cause. Thus, the District was required to follow the requirements of subsection (6) when it fired Oman for cause. Additionally, subsection (9) provides that a district must give "a written notice of suspension or final termination including findings of fact upon which the action is based if the suspension or termination is for cause." *Id.* § 53A–8–104(9).

¶ 44 Oman does not argue that the District failed to follow the procedures contained in subsections (6) and (9). Indeed, our review of the record shows that the District clearly fulfilled its obligations under these two sections.

¶ 45 Because the District was not obligated to follow the requirements of subsections (2) and (3) and because the District fulfilled the requirements of subsections (6) and (9), we conclude that the District did not violate UOSTPA. We therefore affirm the district court's grant of summary judgment to the District on this point.

### III. THE DISTRICT COURT CORRECTLY HELD THAT THE DISTRICT DID NOT VIOLATE THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

¶ 46 Oman argues that the District violated the covenant of good faith and fair dealing with respect to his termination because the District conspired against him and treated him differently from other employees in similar circumstances. The district court concluded that, as a matter of law, there existed no genuine issue of material fact supporting Oman's claim for breach of the implied covenant and therefore dismissed the claim on summary judgment. We affirm.

¶ 47 "An implied covenant of good faith and fair dealing inheres in every contract. Under the covenant of good faith and fair dealing, both parties to a contract impliedly promise not to intentionally do anything to injure the other party's right to receive the benefits of the contract." *Eggett v. Wasatch Energy Corp.*, 2004 UT 28, ¶ 14, 94 P.3d 193 (citations omitted).

> The good faith performance doctrine may be said to permit the exercise of discretion for any purpose—including ordinary business purposes—reasonably within the contemplation of the parties. A contract thus would be breached by a failure to perform in good faith if a party uses its discretion for a reason outside the contemplated range-a reason beyond the risks assumed by the party claiming the breach.

*Markham v. Bradley*, 2007 UT App 379, ¶ 34, 173 P.3d 865 (emphasis omitted)(internal quotation marks omitted).

¶ 48 "[W]hether there has been a breach of good faith and fair dealing is a factual issue, generally inappropriate for decision as a matter of law." *Republic Group, Inc. v. Won–Door Corp.*, 883 P.2d 285, 291 (Utah Ct.App.1994). Summary judgment is appropriate only when reasonable minds could not differ in concluding that the party accused of breaching the covenant did not wrongfully exercise its discretionary power

or contractual authority for a reason beyond the risks that the other party assumed or for a reason inconsistent with the other party's justified expectations. *See Olympus Hills Shopping Ctr., Ltd. v. Smith's Food & Drug Ctrs., Inc.,* 889 P.2d 445, 451 (Utah Ct.App. 1994); *cf. Sanderson v. First Sec. Leasing Co.,* 844 P.2d 303, 306 (Utah 1992) (stating that it is appropriate for a court to grant summary judgment on an issue that is normally a question of fact when no reasonable jury could conclude that fact exists).

¶ 49 The District's conduct in this case does not constitute a breach of the implied covenant of good faith and fair dealing. The Classified Agreement gave the District the contractual authority and the discretion to terminate Oman's employment for any of the reasons listed in the Agreement. As previously mentioned, the district court was bound by the federal court's finding that the District had sufficient grounds to terminate Oman for cause. And the district court also properly concluded that, as a matter of law, the District followed the procedures under the contract and under UOSTPA when it suspended and terminated Oman. In light of these determinations, the district court correctly held that no reasonable person could conclude that the District wrongfully exercised its discretion and authority for a reason beyond the risks assumed by Oman or for a reason inconsistent with Oman's justified expectations. We therefore affirm the district court's dismissal of Oman's claim for breach of the implied covenant of good faith and fair dealing.

## IV. THE DISTRICT COURT PROPERLY DISMISSED OMAN'S CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

¶ 50 Relying upon its dismissal of Oman's first four causes of action, the district court concluded that "as a matter of law, there is no longer any basis in this case for the claim of intentional infliction of emotional distress" and dismissed the claim. On appeal, Oman argues that summary judgment was inappropriate and that he should have been allowed to present this claim to a jury. We disagree.

¶ 51 In order to properly state a claim for the tort of intentional infliction of emotional distress,

> a plaintiff must plead facts that demonstrate that the defendant intentionally engaged in some conduct toward the plaintiff, (a) with the purpose of inflicting emotional distress, or, (b) where any reasonable person would have known that such would result; *and* his actions are of such a nature as to be considered outrageous and intolerable in that they offend against the generally accepted standards of decency and morality.

*Bennett v. Jones, Waldo, Holbrook & McDonough,* 2003 UT 9, ¶ 58, 70 P.3d 17 (internal quotation marks omitted). "Due to the highly subjective and volatile nature of emotional distress and the variability of its causations, the courts have historically been wary of dangers in opening the door to recovery therefor." *Id.* ¶ 59 (citations and internal quotation marks omitted).

¶ 52 "If the trial court determines that a defendant's conduct was not outrageous as a matter of law, then the plaintiff's claim fails, and a court may properly grant the defendant summary judgment on an intentional infliction of emotional distress claim." *Prince v. Bear River Mut. Ins. Co.,* 2002 UT 68, ¶ 38, 56 P.3d 524 (citations omitted).

> It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so. Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.

*Gygi v. Storch,* 28 Utah 2d 399, 503 P.2d 449, 450 (1972) (quoting Restatement (Second) of Torts § 46 cmt. h (1965)).

¶ 53 "To be considered outrageous, the conduct must evoke outrage or revulsion; it must be more than unreasonable, unkind, or unfair." *Franco v. Church of Jesus Christ of Latter-day Saints,* 2001 UT 25, ¶ 28, 21 P.3d 198 (citation and internal quotation marks omitted).

In the employment context, as in other factual settings, liability under the tort of intentional infliction of emotional distress . . . may be found only where the conduct complained of has been so extreme in degree as to go beyond all possible bounds of decency, so as to be regarded as atrocious and utterly intolerable in a civilized society.

45 Am.Jur.2d *Proof of Facts* 261 (1986).

¶ 54 The District's conduct in this case does not even approach atrocious and intolerable conduct. This is especially true in light of our holdings that the District properly followed the procedures of both the Classified Agreement and UOSTPA when it terminated Oman for cause. No reasonable person could conclude that firing an employee under the terms of an employment contract and according to the procedures provided by law is "so extreme and outrageous as to permit recovery." We therefore hold, as a matter of law, that the District's actions were not outrageous.

¶ 55 Because the actions of the District and the District Employees were not outrageous as a matter of law, the district court properly held that Oman could not sustain a claim for intentional infliction of emotional distress. We therefore hold that the district court properly dismissed Oman's intentional infliction of emotional distress claim.

## V. THE DISTRICT COURT CORRECTLY HELD THAT THE DISTRICT EMPLOYEES DID NOT DEFAME OMAN

¶ 56 Oman argues that the District Employees are liable for defamation because each of them "played a role in fomenting and engineering the ordeal through which [Oman] has passed." The district court granted summary judgment in favor of the District Employees on the defamation claim. We affirm that decision.

### A. *The District Court Correctly Struck Portions of Oman's Affidavit That Were Inadmissible Hearsay*

¶ 57 We begin by reviewing the district court's decision to strike portions of Oman's affidavit that supported what Oman referred to as the "[m]ost obvious" incident of defamation. The incident was a meeting held on June 27, 2002—the day Oman received his suspension letter—that involved Swain, May, and many of the District's maintenance employees. In an affidavit, Oman stated that two of his coworkers who attended the meeting—Paul Thurgood and Justin Mott—told Oman about statements made by May during the meeting. The alleged statements made by May were that Oman had been suspended from employment because he had defrauded the District by visiting construction sites during business hours; that Oman was under criminal indictment, would be found guilty, and would be sent to prison; that Oman's conduct was similar to that of a former District employee who had been found guilty of theft and terminated; and that the District intended to make an example of Oman.

¶ 58 The Defendants moved to strike the paragraphs of Oman's affidavit that relied on what Oman was told by Thurgood and Mott. The Defendants argued that the statements were hearsay and were not based on personal knowledge. The district court agreed and granted the Defendants' motion to strike. Having stricken those paragraphs of the affidavit, the district court concluded that Oman was "left without any basis for the defamation claim" and therefore dismissed it. On appeal, Oman argues that the district court misinterpreted the Utah Rules of Evidence. We disagree.

¶ 59 Testimony recounting direct observation of allegedly defamatory statements made by a defendant does not constitute hearsay. This is because the allegedly defamatory statements are not being "offered in evidence to prove the truth of the matter asserted." Utah R. Evid. 801(c). Rather, the statements are being offered simply to prove that they were made by the defendant. *See State v. Olsen*, 860 P.2d 332, 335 (Utah 1993) ("[I]f an out-of-court statement is offered simply to prove that it was made, without regard to whether it is true, such testimony is not proscribed by the hearsay rule." (internal quotation marks omitted)). Thus, in this case, if Thurgood or Mott would have submitted affidavits in which they recounted the statements they

heard May make, such affidavits would not be hearsay.

■ ¶ 60 Nevertheless, Oman's assertions in his affidavit concerning Thurgood's and Mott's statements do constitute hearsay. Oman's assertions are being introduced to prove the truth of the matter asserted: that May made the allegedly defamatory statements. Oman's knowledge is not based on first-hand observation because he was not present at the meeting in which May allegedly made the comments. Instead, his knowledge is based on the declarations of third parties. Therefore, Oman's statements in his affidavit are hearsay. *See Wayment v. Clear Channel Broad., Inc.*, 2005 UT 25, ¶ 47, 116 P.3d 271 (examining the testimony of two coworkers who testified that a secretary had told them that the secretary's boss had made allegedly defamatory statements about the plaintiff to the secretary and determining that the testimony was hearsay). Because the statements are hearsay, they are not admissible unless they fall under an exception to the hearsay rule. *See* Utah R. Evid. 802.

■ ¶ 61 Oman argues that Thurgood's and Mott's statements were not hearsay because they were vicarious admissions under rule 801(d)(2)(D) of the Utah Rules of Evidence. Rule 801(d)(2)(D) states that "[a] statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Utah R. Evid. 801(d)(2)(D).

¶ 62 Oman's argument on this point is hard to decipher. He notes that Thurgood and Mott are employees of the District, that May and Swain are also employees of the District, that Thurgood and Mott were required to attend the meeting, and that May and Swain have some sort of "supervisory responsibility" over Thurgood and Mott. However, Oman fails to explain how any of these facts make Thurgood and Mott the agents of May and Swain or how their statements to Oman regarding what was said in the meeting is a matter within the scope of their alleged agency. Oman admits that he can provide no case law to support his agency argument, and we find no authority for · it. Thus, Oman's argument under rule 801(d)(2)(D) fails.

¶ 63 Oman does not point us to any other exception to the hearsay rule that would render his statements admissible. We therefore conclude that the district court properly struck the paragraphs of Oman's affidavit in which he recounted his coworkers' statements regarding comments they heard May make during the June 27 meeting.

### B. Oman's Claims of Alleged Defamation Fail

¶ 64 In his reply brief on appeal, Oman refers to six incidents of alleged defamation. These include: (1) comments made by May and acquiesced to by Swain at the June 27 meeting, (2) comments made by Payne during a June 2003 meeting between Payne and Thurgood, (3) May's March 21 report sent to the Layton Police Department, (4) May's June 28 follow-up report sent to the Layton Police Department, (5) the March 11 termination letter, and (6) Webster's reports of Oman's alleged misconduct made to District personnel. We address these incidents in turn and conclude that each claim fails.

¶ 65 We first address the incident that Oman refers to as the "most obvious" incident of defamation: the statements made by May during the June 27 meeting with District maintenance workers. Because we have concluded that the district court properly struck from Oman's affidavit the paragraphs discussing this incident, we likewise affirm the district court's conclusion that striking the paragraphs leaves Oman with no evidentiary basis for the defamation claim.

■ ¶ 66 We next dispose of Oman's alleged defamation relating to the June 2003 meeting between Payne and Thurgood and the March 21 report prepared by May. Oman did not refer to these incidents in his pleadings in the district court, and he is therefore barred from raising them for the first time on appeal. *See State v. Labrum*, 925 P.2d 937, 939 (Utah 1996) ("Issues not raised before the trial court are usually waived and cannot be raised on appeal.").

¶ 67 With regard to Oman's remaining three incidents of alleged defamation, the district court did not specifically discuss them in its order granting summary judgment. Nevertheless, we conclude that Oman has failed to present evidence to support them.

¶ 68 "Defamation is the act of harming the reputation of another by making a false statement to a third person." *Jensen v. Sawyers*, 2005 UT 81, ¶ 35, 130 P.3d 325. To establish a claim for defamation, a plaintiff must demonstrate that "(1) the defendant published the statements [in print or orally]; (2) the statements were false; (3) the statements were not subject to privilege; (4) the statements were published with the requisite degree of fault; and (5) the statements resulted in damages." *DeBry v. Godbe*, 1999 UT 111, ¶ 8, 992 P.2d 979.

¶ 69 Oman clearly failed to demonstrate these elements in his pleadings to the district court. In his motion opposing summary judgment, Oman made generalized allegations that defamatory statements were made in certain instances and in certain documents. However, Oman failed to identify the specific statements made during the instances or contained in the documents that were defamatory. He also failed to demonstrate that any such statements were false, not subject to privilege, and negligently published by defendants. *See Wayment*, 2005 UT 25, ¶ 32 n. 13, 116 P.3d 271 ("[A] defamation plaintiff who is not a public figure must ... establish negligence on the part of the defendant."). Additionally, Oman failed to show how the statements resulted in damages.

¶ 70 For example, the extent of Oman's discussion regarding May's June 28 report to the Layton Police Department is one sentence: "May's written report of June 28, 2002 ... which was plainly shared with the School District, clearly paints Mr. Oman as a felon—his vehicle being searched, its contents itemized, etc." The report detailed the procedures the District had taken in giving Oman a notice of suspension and confiscating his office and vehicle keys and related the results of the subsequent search of Oman's District vehicle. The only parts of the report that Oman identifies as being defamatory— his vehicle being searched and its contents itemized—are facts that did occur. Oman does not show that these facts are false or that they were negligently included in the report by May. Oman cites no other specific parts of the report that are allegedly defamatory. Additionally, he fails to show how the report, which was sent to police the day after the District suspended Oman's employment, caused Oman any damage.

¶ 71 Even on appeal, Oman fails to properly support his defamation claim. Because Oman failed to properly plead and support the alleged incidents of defamation, we conclude that the district court properly dismissed his defamation claim. We therefore affirm the district court's grant of summary judgment to the District Employees on Oman's defamation claim.

## VI. THE DISTRICT COURT DID NOT GRANT SUMMARY JUDGMENT FOR AN IMPROPER PURPOSE

¶ 72 Oman's final argument on appeal is that the district court granted summary judgment for an improper purpose. Oman asserts that the court granted summary judgement "as a procedural device to obtain guidance on governing law from this court." While we agree that such conduct would be improper, we see no basis for Oman's assertion that the district court acted with an improper motive in this case. The district court reviewed the District's motion, considered the memoranda in support and in opposition to the motion, and heard extensive oral argument. The district court then issued an order in which it recognized the absence of disputed facts and applied the law to the facts, ultimately concluding that the District was entitled to summary judgment. The district court's actions were proper. We therefore find no error in the court's grant of summary judgment.

## CONCLUSION

¶ 73 The district court properly granted summary judgment to the District and the District Employees on all of Oman's claims. Affirmed.

¶ 74 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice WILKINS, and Justice NEHRING concur in Justice PARRISH'S opinion.