[Civ. No. 22635. Second Dist., Div. Two. May 9, 1958.]

BULLOCK'S, INC. (a Corporation), Respondent, v. SECURITY-FIRST NATIONAL BANK OF LOS ANGELES (a National Banking Association), as Trustee, etc., et al., Appellants.

Iverson & Hogoboom for Appellants.

Macfarlane, Schaefer & Haun and E. J. Caldecott for Respondent.

FOX, P. J.—This is a declaratory relief action to establish the value of certain property as a basis for determining the rental to be paid therefor.

The property in question has a frontage of approximately 35½ feet and a depth of approximately 149½ feet. It is situated in Los Angeles on the west side of Broadway between Sixth and Seventh Streets. The respondent has occupied this and adjoining property for some fifty years, and operates thereon its department store known as Bullock's Downtown. The property was originally leased in 1906 for fifty years by respondent's predecessor in interest. Rent was based upon a fixed percentage of the value of the land. In 1943 respondent entered into a new lease for the subject property commencing immediately after the termination of the prior lease.

The new lease was also for a term of fifty years, commencing June 1, 1956. It contained many provisions identical to those of the prior lease. The rent to be paid for the ten-year period commencing June 1, 1956, was set at "an amount equal to five per cent of the appraised value of the leased land fixed as hereinafter provided, but not less than $17,750 per year."[1] The lease thereafter set forth provisions for appraising the

---

[1] The pertinent rental provisions in the lease read as follows:

"RENT

"For the ten-year period commencing June 1, 1956, the annual rent shall be an amount equal to five per cent of the appraised value of the leased land fixed as hereinafter provided, but not less than $17,750.00 per year.

"For the remaining part of the term the annual rent shall ·be an

value of the land. The appraisal was to be determined as of June 1, 1956, and was to cover the leased land, exclusive of buildings and improvements thereon. Provision was made for

amount equal to five per cent of the appraised value of the leased land fixed as hereinafter provided, but not less than $6,000.00 per year.

''The annual rent shall be paid in twelve equal monthly installments payable in advance on the first day of each calendar month.

*Appraisement*

''The appraised value of the land shall be determined and fixed as at June 1, 1956, for the purpose of fixing rent for the ten-year period commencing June 1, 1956, as at June 1, 1966, for the purpose of fixing rent for the ten-year period commencing June 1, 1966, as at June 1, 1976, for the purpose of fixing rent for the ten-year period commencing June 1, 1976, as at June 1, 1986, for the purpose of fixing rent for the ten-year period beginning June 1, 1986, and as at June 1, 1996, for the purpose of fixing rent for the ten-year period beginning June 1, 1996. The appraisements shall be of the leased land exclusive of the buildings and improvements on the leased land and shall be made as follows: One hundred twenty (120) days before the commencement of each of said periods the Lessors shall appoint an arbitrator and immediately notify the Lessee in writing of the said appointment and of the name and address of the said arbitrator so appointed by them, and the Lessee shall also similarly at said time appoint an arbitrator and immediately notify the Lessors in writing of the said appointment by it. If the said two arbitrators do not within twenty (20) days after their appointment as aforesaid agree upon the value of the said land, then they shall immediately appoint a third arbitrator, and the decision of any two of said arbitrators shall be binding upon the parties hereto, such decision in each respective instance to be rendered on or before thirty (30) days before the commencement of each of said respective periods. The award by said arbitrators shall be made in writing, signed by said arbitrators in duplicate, one of which documents shall be delivered to the Lessors and one to the Lessee herein. Each party will pay the charges of the arbitrator appointed by it and the expenses incurred by such arbitrator. The charges for services of the third arbitrator and the other expenses of the arbitration shall be borne by the parties in equal shares. It is expressly understood and agreed that if the parties hereto can, before the commencement of any of said periods, mutually agree upon the value of said land for either or any of such periods, then no appraisement need be made for any of such periods for which such value is so mutually agreed upon. In such case the amount agreed upon shall be evidenced by a writing, signed in duplicate by the respective parties.

''If for either or any of such periods the parties hereto do not mutually agree upon the value of said land, or if either party hereto for either or any of such periods fails to appoint an arbitrator as hereinbefore provided, or if for any of such periods said arbitrators fail to agree, and failing to agree do not appoint a third arbitrator as hereinbefore provided, or if for either or any of such periods said arbitrator or any two of them, as hereinbefore provided, do not agree upon a valuation before the thirtieth day of preceding such or any of such periods, then the value of said land for such or any of such periods shall be determined by the Superior Court of the County of Los Angeles in an action or actions brought therein for that purpose.

''The provision for minimum rent is not an indication of opinion of value at the present time or for the future and shall not be considered in any way in connection with the appraisements or determinations of value herein provided for.''

the selection of an arbitrator by both the lessors and the lessee. In the event that the arbitrators failed to agree upon a value or failed to agree upon the appointment of a third arbitrator, "the value of said land . . . [was to] be determined by the Superior Court of the County of Los Angeles in an action . . . brought therein for that purpose."

Arbitrators were appointed by the lessee and the lessors, but the arbitrators did not agree upon a valuation nor upon the appointment of a third arbitrator. After the expiration of the periods prescribed in the lease, respondent filed this action, requesting that the court determine the value of the land so that rent could be established as provided in the lease. Appellants answered seeking similar relief and praying for an award of their costs in the proceedings, including attorneys' fees.

The trial court determined that the value called for in the lease was the land's fair market value, and set that value at $478,980. The court entered judgment accordingly, also ordering that each side should bear its own costs. The lessors have appealed.

Appellants' initial contention is that the trial court erred in basing his decision as to the value of the land on its fair market value on the date in question.[2] Their theory is that the language used in the lease ("the value of said land," "the appraised value of the leased land," and "the appraised value of the land . . . for the purpose of fixing rent") meant something different from fair market value. We cannot agree with this contention. Our principal task in this case is to determine the intent of the parties from the language appearing in the lease. A careful reading of the lease convinces us that the parties intended that the fair market value of the land on June 1, 1956, should be used as the basis for calculating the rental for the ten-year period commencing on that date. The lease itself states that in the event arbitration fails the court is to determine "the value of said land." While the word "value" has several different meanings, it is well recognized that " 'value,' in connection with legal problems, ordinarily means market value." (*Bag-*

---

[2]Paragraph III of the judgment reads: "The words 'the value of said land,' 'the appraised value of the leased land,' 'the appraised value of the land' and 'the appraised value of the land shall be determined . . . for the purpose of fixing rent for the ten-year period commencing June 1, 1956 . . . ,' as such terminology is used in the section of said lease numbered 4, all denote the same concept of value as is denoted under the law by the term 'fair market value.' "

*dasarian* v. *Gragnon*, 31 Cal.2d 744, 753 [192 P.2d 935].)
"The term cannot be given a limited or special meaning, as distinguished from its usual definition, unless an intention to so use it appears." (*Bunnell* v. *Baker*, 104 Cal. App. 313, 317 [285 P. 877, 286 P. 1090]; see also Code Civ. Proc., § 16.) "When applied without qualification to property of any description, ['value'] necessarily means the price it will command in the market." (2 Bouvier, Law Dictionary, 8th ed., 3387.) There is nothing in the rental provisions which indicates that something other than market value was intended. The duty of the appraisers was to determine the "value of the land." This value was to be determined "as at June 1, 1956, for the purpose of fixing rent for the ten-year period commencing June 1, 1956, as at June 1, 1966, for the purpose of fixing rent for the ten-year period" commencing on that date, and so forth for the five decades of the lease. Appellants argue that the phrase "for the purpose of fixing rent" shows an intent to qualify the word "value" and give it a meaning different from ordinary market value. But it is obvious from the context in which the words are used that they refer only to the ten-year period for which the appraisal in question fixes the value of the land, such value being an essential factor for determining the rent to be paid during such period. The only word which qualifies "value" in the rental provisions is "appraised," and this merely means that the "value" is ascertained by appraisers; that which is being determined is still the "value of the land." Moreover, the parties provided elsewhere in the lease: "The language in all parts of this lease shall in all cases be construed simply according to its fair meaning. . . ." Since the usual definition of "value" in an appraisal context is "monetary worth of a thing; marketable price" (Webster, New International Dictionary, 2d ed.), it is clear that the parties intended that the annual rent for the ten-year period commencing June 1, 1956, should be five per cent of the fair market value of the land on that date.

Appellants properly point out that "value" means value *in use* (i.e., the utility of an object) as well as value *in exchange* (i.e., an object's worth in terms of marketable price). (See 2 Bouvier, *op. cit. supra*, 3387.) But it is clear that the parties did not intend *use* value in the rental provisions. The lease calls for a determination of the value of the land, not the value of the use of the land for any particular purpose. The entire context shows that the parties had in mind the prop-

erty's worth rather than its utility for a given purpose. The issue should not be confused by the fact that the actual annual rent figure is obtained by taking five per cent of the appraised value. It is obvious from the rental provisions that the parties were contracting for the lessors to receive as rent a fixed percentage return on the value of the land, such value to be redetermined every ten years. They might have agreed on four per cent or six per cent, but they chose five instead. Moreover, it must be remembered that this is a "net" lease—i.e., the lessee pays *all* taxes and other expenses in connection with the property. From the method of calculation which the parties agreed upon it may reasonably be inferred that they were thinking in terms of interest rate on a capital investment. They fixed the net rate of return on the lessor's investment at five per cent, but they also provided for fluctuation in the value of such investment. They realized that this capital asset might fluctuate in value from time to time and therefore provided for periodic reevaluation in order that the lessors might continue to receive a five per cent return on the value of their investment. When the parties referred to the "value" of the land in question they meant its monetary worth or marketable price—i.e., its *market value.*

Appellants argue that "if the parties had intended market value, they would have said market value." However, we have already pointed out that using merely the word "value" in the lease indicates that the parties meant market value. In fact, it seems clear that if the parties had intended anything *other than* market value, they would have said so expressly.

In this connection appellants also argue "market value" was not intended because, while those words were not used in the rental provisions, they did appear in a provision of the lease concerning repair and maintenance of the building and improvements on the property. It should first be noted that the latter provision deals with an altogether different subject matter—the method of determining the minimum cost of reconstructing improvements under certain conditions. Moreover, reading the lease as a whole makes it obvious that the use of the phrase "market value" in the repair and maintenance section does not indicate that the parties intended some other criterion of value in the rental provisions because of the absence of the word "market." This is illustrated by the condemnation provisions of the lease which make several references to the "value of the land." It is elementary that "value" in connection with condemnation proceedings ordi-

narily means market value. (*San Diego Land & Town Co.* v. *Neale,* 78 Cal. 63, 67-68 [20 P. 372, 3 L.R.A. 83] ; *Joint Highway Dist* v. *Ocean Shore R.R. Co.,* 128 Cal.App. 743, 753-754 [18 P.2d 413].) The parties were undoubtedly referring to market value in the condemnation provisions even though they did not use the word "market."

The final paragraph in the condemnation section lends further support to our conclusion that the parties meant market value in the rental provisions. The paragraph provides that in the event of partial condemnation of the leased property the rent for the balance of the ten-year period during which the condemnation takes place shall be reduced by a sum equal to five per cent per annum "of the amounts awarded as compensation for the land taken and damages to the portion of the land remaining."[3] Compensation for the land taken plus damage to the land remaining (severance damage) is equivalent to the difference between the market value of the land before condemnation and the market value of what is left after condemnation. The parties have thus provided for a reduction in rent based upon the difference between the market value of the land before condemnation and the market value of what remained thereafter. And the reduction is calculated in the same manner as that provided for calculating rent—five per cent per annum of the predetermined amount. Since the lease provides that a reduction in rent due to partial condemnation is to be measured by the drop in market value of the property covered by the lease, it may reasonably be inferred that the parties were thinking in terms of market value when they drafted the provisions of the lease relating to the calculation of rent.

The cases relied upon by appellants are not in point. They deal with rental value—the value of the use of the land for any purpose for which it is adapted. Rental value is measured partially in terms of time, by the month or by the year, et cetera. The parties were not fixing rental value in the lease, they were fixing rent. They determined such rent by taking a

---

[3]The entire paragraph reads as follows:

"If a part of the leased property is condemned and taken and the lease is continued in force and the actual possession of said part is required and taken during a ten-year period for which the appraised value has been fixed on the basis of the entire leased property, the rent for the balance of the said ten-year rent period provided for in Paragraph 4 hereof shall be reduced by a sum equal to five per cent (5%) per annum of the amounts awarded as compensation for the land taken and damages to the portion of the land remaining."

fixed percentage of the full value (not the rental value) of the land. The parties based rent upon the *fair market value* of the property rather than upon its rental value for any given period of time.

From the foregoing it is clear that the trial court did not err in basing his decision as to the value of the property on its fair market value.

■ Appellants' next contention is that the trial court erred in disregarding the testimony of their expert witness concerning the value of the land. They also contend that the court erred in refusing to strike the testimony of one of respondent's experts (Sayer) on the ground that he failed to consider the effect of the lease on the value of the property in determining that value. ■ It is elementary that in a case tried without a jury the evaluation of a witness's testimony and the weight which it is to be given are matters within the discretion of the trial court. (*Donlon* v. *Donlon,* 140 Cal.App.2d 428, 430 [295 P.2d 51] ; *Beeler* v. *Plastic Stamping, Inc.,* 144 Cal.App.2d 306, 308 [300 P.2d 852].) ■ The trial court in the instant case did not abuse that discretion merely by giving more weight to the testimony of respondent's experts than to that of appellants' experts.[4] ■ Nor did the

---

[4]The following is a brief summary of the testimony of each of respondent's expert witnesses:

Mr. Sayer testified that he had examined the lease and that he inspected the property and maps of the area; he obtained the assessed valuation of properties in the area; he secured information concerning all the sales of nearby property over a period of five years; he obtained the sales volume figures of lessees in the vicinity; he interviewed owners and proprietors. He stated that he took into consideration all of the above factors. He considered the physical aspects of the property, the terms of the lease concerning the method of appraisal, the rentals being paid in the area, and the effect of decentralization of the downtown property. He gave consideration of varying degrees to at least fifteen of the thirty sales he had investigated, and gave particular consideration to three sales within six months of the date of valuation. He was of the opinion that the market value of the property was $450,000.

Mr. Little also visited the property, obtained records of sales and leases of nearby property within five years, talked to owners, and examined other properties in the vicinity. He obtained the square footage of the various properties and their assessed values. He secured data concerning retail sales volumes in the downtown area. He interviewed buyers and sellers of comparable properties, studied market conditions, spoke with mortgage bankers familiar with the downtown area, and read the lease on the subject property. He considered the size and scope of the subject property to determine its ''highest and best use, either with the present or an alternative improvement.'' He concluded that the property had a fair market value of $443,500.

Mr. Ross testified that he examined the property and photographed it. He obtained information concerning nearby sales, rentals, and so forth. He examined several leases, including the lease in question. He exam-

court err in refusing to strike Sayer's testimony. His method of appraisal (in regard to ignoring the effect of the lease on the property's value) finds judicial support in two well-reasoned decisions dealing with lease provisions quite similar to those in the case at bar: *Columbia Theatre Amusement Co.* v. *Adsit*, 211 Ill. 122 [71 N.E. 868], and *Springer* v. *Borden*, 210 Ill. 518 [71 N.E. 345]. *People* v. *Dunn*, 46 Cal.2d 639 [297 P.2d 964], relied upon by appellants, does not state a contrary rule. That was a condemnation case in which the judgment was reversed because the trial court had stricken the testimony of an expert witness when it appeared that his opinion as to the value of the land included an amount as a "bonus factor" for a lease upon the property. The court held that the jury should have been permitted to consider the expert's testimony in regard to the lease because income from property in the way of rent is a proper element to be considered in arriving at the compensation to be paid for the taking of property. The question involved in the case at bar is entirely different. While rental income is normally a proper factor to be considered in determining the value of property, it obviously cannot be considered when property is being appraised for the very purpose of determining the rent which should be paid. The rent cannot even be determined until a valuation of the land has been made. This principle is ably explained by the court in the Springer case (p. 346):

"The lease provided that the lessee should pay as rent a sum equal to 5 per cent of the cash value of the demised premises, exclusive of the buildings and improvements which might be thereon. . . . The court construed the value of the demised property as contained in the lease to mean the cash value of the naked lot with a clear title in fee simple. The complainant insisted that the court ought to find the cash value of the fee simple as depreciated by the lease upon it, or, in other words, the cash value of the reversion. . . . Anyone buying the reversion would pay more if the lease called for 10 per cent per annum on the value than if it called for 5, as in this case, and

---

ined much data concerning the conditions of downtown Los Angeles during the period in question. He prepared a map of the area and used it in his considerations. He studied the above data and arrived at a valuation of $450,000.

Cross-examination of each of these witnesses indicated that they were thoroughly familiar with the data upon which they based their opinions, including the rentals of other property in the vicinity.

would pay more if the lease called for 5 per cent than if it called for 4, which the evidence showed to be the basis for the market value of such estates when the cause was heard. Certainly, it would never be thought that a tenant must pay more rent by raising the value of the reversion because the rental fixed in his lease is high, and consequently the reversion more valuable, and it would be equally unjust that he should pay less by reducing the valuation because his lease calls for a low rate and therefore the reversion is less valuable. The value of anything, in the common understanding, is the value of the full title, and not a value over and above some incumbrance. The cash value of the lot, exclusive of the buildings and improvements thereon, can mean nothing else than the value of the full title to the lot. According to the theory of complainant, a lease under very favorable terms to the lessee may be made still more favorable to him by showing that the terms of the lease depreciate the value of the reversion. A reduction in the value of the reversion would be equal to a reduction of rent, and the reduction of rent would reduce the value of the reversion, and so on in endless succession. The rule contended for is wholly impractical, for the reason that, as long as the net annual rental is unknown, the net value of the reversion cannot be ascertained, one of the necessary elements for fixing such value being lacking. No such plan for fixing the rentals could have been anticipated by the parties. Our conclusion is in accord with the decision in *Goddard* v. *King,* 40 Minn. 164 [41 N.W. 659], and it is supported in principle by *Philadelphia Library Co.* v. *Beaumont,* 39 Pa. 43, and *Lowe* v. *Brown,* 22 Ohio St. 463. The value of the property for the purpose of fixing the rents could neither be increased by the fact that the burden on the lessee was great and the terms of the lease favorable to the lessor, nor reduced by the fact that the burden was light and the lease favorable to the lessee.'' It is thus clear that the ruling in the Dunn case is not applicable to the case at bar.

The cases cited by appellants in support of the testimony of their expert are not in point. Those cases involved valuation of a lease or leasehold interest rather than valuation of land.

■ Appellants contend that the trial court erred in receiving certain charts in evidence and in permitting one of respondent's witnesses to testify concerning figures on the charts. They argue that the charts were hearsay and that there was an insufficient foundation for their admission into

evidence. The charts in question show the vehicular passenger traffic entering the downtown area between 1941 and 1955. They bore little relevance to the questions before the court. Even if it were to be conceded that there was error, such error was not prejudicial and cannot be the basis of a reversal. (Cal. Const., art. VI, § 4½.)

■ Appellants contend that the court restricted the testimony of their expert when he was giving the reasons for his opinion as to the value of the property, and that the court erred in denying the admission into evidence of one of appellants' exhibits. The record discloses that appellants' expert was permitted to testify in great detail concerning the method by which he arrived at his opinion and his reasons therefor. The chart in question was a per front-foot per month breakdown of rentals paid by other stores near the subject property. The witness testified that he used the data appearing on the chart in order to check the opinion at which he had arrived. Even though the chart was not received in evidence, the witness was permitted to testify that he had checked the rentals of the nearby stores and used the data in forming his opinion. It is thus clear that no prejudicial error could have occurred.

■ Appellants' final contention is that the trial court erred in denying them costs and attorneys' fees in this action. The lease provided that the lessee would pay the lessors costs and reasonable attorneys' fees if the latter, without fault on their part, became involved in litigation ''arising out of the Lessee's use of the leased property or its acts in connection with this lease. . . .''[5] However, it is clear that the instant suit did not arise out of respondent's use of the property or its acts in connection with the lease. The suit arose out of the terms of the lease itself. The lease requires such a suit in the event the appointed arbitrators do not agree upon the value of the land or upon the appointment of a third arbitrator. The disagreement of the arbitrators cannot be said to be an

---

[5]The entire paragraph in question reads as follows:

''If the Lessors without fault on their part shall be made parties to any litigation commenced by or against the Lessee involving the enforcement of any of the rights or remedies of the Lessors against the Lessee, or arising on account of a default of the Lessee in respect of any of the covenants or conditions in this lease, or arising out of the Lessee's use of the leased property or its acts in connection with this lease, then the Lessee will pay all costs and reasonable attorney's fees incurred by or assessed or charged against the Lessors in connection with such litigation, and will also pay the costs and reasonable attorney's fees incurred by the Lessors in enforcing the covenants and conditions of this lease.''

act by respondent in connection with the lease. Such disagreement is as much the fault of the lessors as it is the fault of the lessee. The lessors are therefore not entitled to costs and attorneys' fees under the provision now under consideration.

That the parties did not intend the lessors should recover costs and attorneys' fees in such a suit as the present one is demonstrated by the arbitration provisions in the lease. It is provided that "each party will pay the charges of the arbitrator appointed by it and the expenses incurred by such arbitrator"; and that "the charges for services of the third arbitrator and the other expenses of the arbitration shall be borne by the parties in equal shares." Thus, the parties contemplated that the expenses of arbitration would be shared. No express provision is made in the arbitration section concerning costs and attorneys' fees in a suit to determine the value of the property. Since these expenses are the result of a substitute for arbitration, the obvious conclusion is that the parties intended that they should be shared. If, regardless of the outcome of such a suit, the lessee should be required to pay the lessors' costs and attorneys' fees, then the lessors would always be in a position to hold out for an increase in valuation equal in amount to their costs of litigation which the lessee would have to bear in any event. Such a one-sided advantage could not have been intended by the parties.

The judgment is affirmed.

Herndon, J., concurred.

Mr. Justice Ashburn, deeming himself disqualified, did not participate herein.