2010 UT App 284

COOK ASSOCIATES, INC., dba Cook Slurry Company, a Utah corporation, Plaintiff and Appellant,

v.

UTAH SCHOOL AND INSTITUTIONAL TRUST LANDS ADMINISTRATION, Defendant and Appellee.

No. 20090330–CA.

Court of Appeals of Utah.

Oct. 15, 2010.

Blake S. Atkin and Joseph H. Pugsley, Bountiful, for Appellant.

Thomas A. Mitchell, Salt Lake City, for Appellee.

Before Judges McHUGH, ORME, and CHRISTIANSEN.

## OPINION

McHUGH, Associate Presiding Judge:

¶1 Cook Associates, Inc. (Cook) appeals the trial court's grant of summary judgment in favor of the Utah School and Institutional Trust Lands Administration (SITLA). We reverse and remand, in part, and affirm, in part.

## BACKGROUND

¶2 On June 13, 1978, Cook and SITLA's predecessor agency, the Division of State Lands & Forestry,[1] entered into a forty-nine year ground lease (the Lease) for the use of school trust lands near Lehi, Utah, (the Property) for the purpose of operating an explosives manufacturing plant. Paragraph 11 of the Lease gives SITLA discretion to adjust the rental rate for the Property every

1. Hereinafter, we refer to both SITLA and the Division of State Lands & Forestry interchange-

five years "as [SITLA] shall deem to be reasonably necessary in the best interest of the State." The initial rental rate for the Property was $3,000 per year to be paid "on a calendar year basis in advance on or before the first day of June of each year." SITLA did not exercise its right to adjust the rent at the first five-year interval in 1983.

¶3 Early in the Lease, Cook began to experience financial difficulties. In January 1987, Merrill Cook (Mr. Cook), Cook's Chief Executive Officer, wrote to SITLA requesting a reduction in the rental rate, claiming that the explosives plant had not been in operation since the fall of 1984; that the Federal Aviation Agency had sued Cook for significant damages due to a dispute over the access road to the plant; and that the mining industry, the market for the plant's products, had been depressed for the past several years. Based on these economic factors, Mr. Cook requested "deferment of [L]ease payments [for at least one year] until the plant can become operational and profitable once again rather than forcing an out-and-out permanent closing of the plant." When that request was denied, Mr. Cook asked SITLA to reconsider, stating that the company had "already paid an enormous amount for a few acres" and that the $3,000 annual rental fee then in effect was "highway robbery."

¶4 SITLA did not raise the rent in 1988 and agreed to allow Cook to defer a portion of the rent for five years. In addition, SITLA agreed to amend the Lease to include 475 acres as a buffer zone around the facility. Although Mr. Cook acknowledged that the express inclusion of the buffer zone made "the cost of leasing the five acres [on which the facility was actually located] more palatable," he still believed that Cook was "paying a lot given the market value of the acreage [the company] actually use[d]." Despite Cook's renewed request that it be relieved of its obligation to pay the rent in 1987, SITLA concluded that it could not "legally waive any portion of [the L]ease fees," explaining, "[W]e do not own this land but are trustees and, as such, are bound by strict legal and

ably as "SITLA."

fiduciary constraints. We are sympathetic to your situation, but we hope you realize we do not have the flexibility a private landowner would have." As a result, the parties amended the Lease in 1988 to defer a portion of the rent and to add the 475–acre buffer zone.

¶ 5 The next rental adjustment window occurred in 1993. In anticipation of an increase in the rental obligation, Mr. Cook wrote to SITLA on May 2, 1992, indicating that the buffer zone was of no value to Cook, in part because the company had not manufactured packaged blasting agents at the site for some years and "may or may not" do so again in the future. Mr. Cook also claimed that Cook had already paid SITLA $34,950 for the Property, which Mr. Cook concluded was "worth, at most, $7,500 in total." Notwithstanding Mr. Cook's assertions, in 1993, SITLA increased the rent to $3,610 per year. In doing so, SITLA recognized that the Property was "being used as a buffer area and manufacturing site" and indicated that the recommended increase was "[b]ased upon the Board-approved index for this type of lease ... [and] represent[ed] a 16.2% increase for industrial use during this five-year period."

¶ 6 In 1998, SITLA proposed that the rental rate be increased again, this time to $4,560 per year. In response, Cook admitted that "land values in the area ha[d] increased and ... the increase [SITLA] proposed [was] rather modest," but requested that the rent not be increased because the Utah facility had not generated any profit "for quite some time." SITLA denied the request and increased the rent as proposed.

¶ 7 During the five-year period between the 1998 rent increase and SITLA's next opportunity to adjust the rate in 2003, land values in the Lehi area continued to increase significantly. According to Cook, in 2000, SITLA transferred responsibility for the Lease from its Surface Group to its Planning and Development Group. Cook asserts that the Planning and Development Group markets and develops trust lands, while the Surface Group administers long-term leases. In 2003, SITLA commissioned development plans for the Property, which resulted in a new appraisal.

¶ 8 On August 1, 2003, Cook filed a petition with the United States Bankruptcy Court for the District of Minnesota seeking a Chapter 11 reorganization. At a hearing in the bankruptcy proceeding, Mr. Cook testified that due to defective product from its supplier, PCS Sales, Inc., Cook lost its mining customers and closed its Lehi, Utah plant in approximately 1999 or 2000.[2] Indeed, Cook's bankruptcy petition indicates that the Lehi facility generated no income for the years 2001, 2002, and 2003. On September 16, 2003, the bankruptcy court dismissed Cook's petition based upon the bankruptcy trustee's conclusion that Cook did not have sufficient funds to purchase insurance on any of its assets, was no longer operating, and had no source of income from which it could pay the administrative expenses of the Chapter 11 proceeding.

¶ 9 Pursuant to the new appraisal based on development plans for the Property, on May 27, 2004, SITLA attempted to raise Cook's rent from $4,560 to $345,600 per year, to be applied retroactively to June 1, 2003. Cook challenged this increase before SITLA's Board of Trustees (the Board) on the grounds that notice of the increase was untimely under the Lease and that "by raising the rental amount by seventy-five times (a 7500% increase) the current [L]ease amount, ... SITLA [was] acting in bad faith." The Board bifurcated the issues, devoting the first phase of its proceedings to the question of whether Cook had timely notice of the rent increase; only if it determined that Cook had received timely notice would the Board proceed to the second phase and consider Cook's allegation that SITLA acted in bad faith.

¶ 10 On May 4, 2005, the Board issued its Findings and Order, concluding that Cook did not receive timely notice of the proposed rental increase. The Board found that although Mr. Cook and his wife met with SITLA employees before the June 1, 2003 dead-

---

2. Cook sued PCS Sales, Inc., but the matter was resolved by summary judgment in favor of the defendant.

line for adjusting Cook's rental obligation, they were not specifically informed of the proposed increase. Although the Board found that the SITLA employees believed that rental rates would go up immediately on the current leasehold site if Cook did not agree to relocate, it found no evidence that this understanding had been clearly communicated to the Cooks. Thus, the Board concluded that Cook received no timely actual notice of the adjustment.

¶ 11 In rejecting SITLA's argument that the large increase in the value of the surrounding property itself was enough to put Cook on constructive notice that the rent would increase on June 1, 2003, the Board stated,

> It was not unreasonable for Cook to believe that [SITLA] might be willing to hold rental due under [the Lease] to a figure near the previous rate, despite the changed nature of the area, since this precise approach had been taken in adjusting the rentals in 1998. Mr. Burton[, a longtime SITLA employee,] testified that [SITLA's] lease rental rates are often determined by using a percentage of the appraised value of the lease property, typically around five to seven percent.... [I]t is obvious that the customary process Mr. Burton testified to was not followed in the 1998 adjustment. The 1998 rental rate was set at $4,560 per year, or $9.50 per acre, despite the fact that lands in the area were then being valued at around $7,000 per acre.... Under a five to seven percent of appraisal approach, [SITLA] could have proposed a $350 to $490 per acre, or a $168,000 to $235,200 per year, rental rate in its 1998 adjustment.

Because SITLA had not adjusted the rent to reflect actual land value in 1998, the Board concluded that the changing nature of the area "was not enough, in and of itself, to alert Cook to a rent escalation for 2003."

¶ 12 As a result of the Board's decision, SITLA was unable to impose a rental adjustment in 2003. However, on July 20, 2005, SITLA sent a letter (the 2005 Letter) advising Mr. Cook against making improvements to the Property because SITLA intended to adjust the rent to "an amount equal to market value" at the next renewal date in 2008. On October 30, 2006, Cook filed a complaint against SITLA, alleging breach of the covenant of quiet enjoyment, breach of the covenant of good faith and fair dealing (the Covenant), and inverse condemnation. Cook requested damages, as well as a declaration that SITLA is required to increase rent according to the fair market value of the Property based on its use as an explosives facility, rather than the Property's value based on its potential residential use.

¶ 13 SITLA and Cook filed cross-motions for summary judgment. Thereafter, SITLA officially notified Cook that the rental rate would be $1,288,690 per year as of June 1, 2008. Cook did not challenge that rental increase in an agency proceeding before the Board, instead proceeding with the lawsuit. In the trial court, SITLA moved to strike as hearsay Mr. Cook's affidavit alleging that, at the time the Lease was entered into, a SITLA representative told Mr. Cook that the rental rate would only be increased in response to changes in SITLA's overhead costs. SITLA also moved to strike, on grounds of timeliness, two affidavits alleging that SITLA had discouraged third parties from investing in Cook due to SITLA's expectation that the rental increase anticipated in 2008 would make continued viability of the business unlikely.

¶ 14 On March 17, 2009, the trial court entered a written order granting SITLA's summary judgment motion and denying Cook's. The trial court concluded that the Lease was subject to "controlling state law and on-going rule making relevant to [l]ease administration," including Utah Code section 53C–1–302, which directs SITLA to obtain "not less than fair market value for the use" of trust land, see Utah Code Ann. § 53C–1–302(1)(b)(iii) (2009), and rule R850–30–400 of the Utah Administrative Code, which provides that "[a]djustments in base rentals may be based upon changes in market value including appreciation of the subject properties," Utah Admin. Code R850–30–400. The trial court also determined that the Lease was not ambiguous and that the phrase "best interest of the State" as used in paragraph

11 of the Lease "is determined by fair market value, indicated by the highest and best use of the land." Because it concluded that the 2005 Letter was a valid exercise of SITLA's contractual rights, the trial court granted summary judgment against Cook on all claims. For the same reasons, the trial court denied Cook's cross-motion for summary judgment. After granting SITLA's summary judgment motion, the trial court denied the motions to strike on grounds of mootness. Cook appeals.

## ISSUE AND STANDARD OF REVIEW

¶ 15 Cook argues that the trial court erred both in granting SITLA's motion for summary judgment and in denying Cook's cross-motion for summary judgment.

> For summary judgment to be appropriate, there must be no genuine issue of material fact. The moving party must be entitled to judgment as a matter of law. When reviewing a grant of summary judgment, we view the facts in the light most favorable to the non-moving party. We grant no deference to the district court's conclusions of law and review them for correctness.

*Bowman v. Kalm,* 2008 UT 9, ¶ 6, 179 P.3d 754 (citation and internal quotation marks omitted).

## ANALYSIS

### I. The Trial Court Erred in Granting SITLA's Summary Judgment Motion on Cook's Good Faith and Fair Dealing Claim.

 ¶ 16 "An implied covenant of good faith and fair dealing inheres in every contract. Under the covenant of good faith and fair dealing, both parties to a contract impliedly promise not to intentionally do anything to injure the other party's right to receive the benefits of the contract." *Oman v. Davis Sch. Dist.,* 2008 UT 70, ¶ 47, 194 P.3d 956 (internal quotation marks omitted).[3] While the Covenant is imposed by law in virtually every contract, there are some important limitations on its scope: the Covenant cannot be used (1) to create new or independent rights or obligations to which the parties have not agreed in the contract; (2) to establish rights or duties inconsistent with the express terms of the contract; or (3) to require a party to exercise an express contractual right in a manner detrimental to its own interests in order to benefit the other party to the contract. *See Oakwood Vill. LLC v. Albertsons, Inc.,* 2004 UT 101, ¶ 45, 104 P.3d 1226.

### A. The Lease Is Silent on the Method for Adjusting Rent.

 ¶ 17 SITLA argues that it could not have breached the Covenant because the Lease unambiguously permitted it to calculate the rent according to the Property's fair market value based on its highest and best use.[4] The trial court agreed. *See generally id.* (holding that the covenant of good faith and fair dealing cannot create duties inconsistent with the express terms of the contract). In contrast, Cook contends that SITLA breached the Covenant because "[b]eginning in about 2000, SITLA began to manage [the Lease] in a way that was inconsistent with the expectations that Cook

---

3. SITLA contends that Cook cannot contest the reasonableness of the rental increase because Cook failed to appeal the 2008 increase to the Board and, therefore, did not exhaust its administrative remedies as required by Utah Code section 63G–4–401, *see* Utah Code Ann. § 63G–4–401 (2008) ("A party may seek judicial review only after exhausting all administrative remedies available."). However, that section of the Utah Code "does not govern ... the management and disposal of school and institutional trust land assets." *See id.* § 63G–4–102(2), (2)(g). Instead, the requirement that Cook exhaust its administrative remedies is found in the rules promulgated under the State and Institutional Trust Lands Act, which also provides that "[a] party may seek judicial review only after exhausting all administrative remedies available," Utah Admin. Code R850–8–1800(2). We agree with SITLA that Cook may not challenge the reasonableness of the 2008 rent increase in this appeal. Indeed, Cook conceded as much at oral argument, indicating that the 2008 adjustment was merely further evidence of SITLA's inappropriate motive to deprive Cook of the benefits of the long-term Lease.

4. Cook argues, to the contrary, that the parties understood this clause to permit only "minor administrative charge-type increases and nothing more."

reasonably had as the holder of a long term lease."

¶ 18 The rental adjustment clause contained in paragraph 11 of the Lease states, "[Cook] agrees that [SITLA] shall have the right to adjust the annual rentals hereunder at the end of each five (5) year period as [SITLA] shall deem to be reasonably necessary in the best interest of the State." SITLA contends that paragraph 11 gives it an essentially unfettered right to raise the rent and, thus, Cook cannot prevail on a claim for breach of the Covenant as a matter of law. *See generally Brown v. Moore*, 973 P.2d 950, 954 (Utah 1998) ("[W]e will not interpret the implied covenant of good faith and fair dealing to make a better contract for the parties than they made for themselves."). However, the Lease gives no guidance as to how rental adjustments should be calculated, instead providing only that SITLA make the adjustments as it deems "reasonably necessary in the best interests of the State." The Lease provides no formula or methodology to be employed by SITLA in making that "best interest" determination. Thus, while fair market value based on the Property's highest and best use is one method for calculating rental adjustments, there is no term in the Lease that expressly prohibits SITLA from calculating the rental rate based upon other criteria.

B. A Fair Market Value–Based Adjustment of the Lease Rental Rate Is Not Required by the Utah Constitution, Statute, or Rule.

¶ 19 SITLA asserts that article XX, section 2 of the Utah Constitution, Utah Code section 53C–1–302(1)(b)(iii), and rule R850–30–400 of the Utah Administrative Code are incorporated into the Lease and that these provisions mandate a fair market value calculation based on the highest and best use of the Property. Cook, in turn, denies that the constitution mandates a fair market value-based adjustment and argues that the statutory provision and administrative rule, which were adopted long after the Lease was executed, are inapplicable.

¶ 20 We first consider the language of the Utah Constitution, which provides that the lands granted to Utah under the Utah Enabling Act "are declared to be school and institutional trust lands, held in trust by the State for the respective beneficiaries and purposes stated in the Enabling Act grants." Utah Const. art. XX, § 2. The Enabling Act, in turn, granted the specific trust lands to Utah upon its admission into the United States. *See* Utah Enabling Act, ch. 138, 28 Stat. 107 (1894). Relying on these authorities, SITLA contends that it has a "constitutional mandate to obtain not less than fair market value for the use of school trust assets." We first note that article XX of the Utah Constitution does not expressly refer to fair market value or address any method of generating revenue from the trust lands. Furthermore, the supreme court's recent decision in *State v. Mathis*, 2009 UT 85, 223 P.3d 1119, addressing SITLA's role and responsibilities as the constitutionally-established trustee for the school trust lands does not support SITLA's argument that it has a constitutional status that somehow enhances its contractual rights.

¶ 21 In *Mathis*, SITLA filed a quiet title action with respect to school trust land it had conveyed over ninety years earlier without reserving the mineral estate. *See id.* ¶¶ 3, 7. Although the statute of limitations had long since expired, SITLA argued that the constitutional and statutory provisions governing the school trust lands "confer upon [the State] an absolute right to receive full value for school trust lands and that this right cannot be taken away by operation of other law." *Id.* ¶ 14. *See generally* Utah Const. art. XX, § 2; Utah Code Ann. § 53C–1–102(1)(b), (2)(b) (2009). The supreme court rejected SITLA's proposal that the State be permitted to, "at any time, point to its own past failure to obtain full value as the basis for overturning its prior conveyance of school trust lands—with the cost of the State's error being borne by the innocent third-party purchaser or its successors in interest." *Mathis*, 2009 UT 85, ¶¶ 14–15, 223 P.3d 1119. Explaining that article XX "does nothing more than impose on the State the fiduciary obligations of a trustee," *id.* ¶ 15, the supreme court held that it does not give SITLA an absolute *"right* to obtain 'full value' for

trust lands," *id.* ¶ 17. Rather, the supreme court clarified that the State should be treated no differently than any other trustee, *see id.* ¶ 20, and affirmed the trial court's decision granting summary judgment against the State, *see id.* ¶ 39. In doing so, the *Mathis* court disavowed its earlier decision in *Consolidation Coal Co. v. Utah Division of State Lands & Forestry*, 886 P.2d 514 (Utah 1994), *see Mathis*, 2009 UT 85, ¶ 33, 223 P.3d 1119, which held that a lease of trust lands for less than full value was null and void, *see Consolidation Coal*, 886 P.2d at 525–27 & n. 17.[5] Whether SITLA has conveyed fee simple or merely a leasehold, *Mathis* refutes any argument that SITLA's role as the trustee of the school trust lands gives it an absolute right to obtain full value for trust property, if to do so would infringe upon the preexisting contractual rights of third parties. *See Mathis*, 2009 UT 85, ¶¶ 14, 38, 223 P.3d 1119.

¶ 22 We next address SITLA's argument that Utah Code section 53C–1–302(1) required it to increase the rental rate from $4,560 per year to $1,288,690 per year because that new rent reflects the fair market value of the Property if subdivided for residential use. While the statute directs SITLA to obtain "not less than fair market value for the use" of trust land, Utah Code Ann. § 53C–1–302(1)(b)(iii) (2009),[6] this mandate is "subject to" section 53C–1–302(2), *see id.*, which requires SITLA "to optimize trust land revenues consistent with the balancing of short and long-term interests, so that long-term benefits are not lost in an effort to maximize short-term gains," *id.* § 53C–1–302(2). Additionally, nothing in the statute requires that market value be based on the highest and best use of the property. Thus, even under the current statute and as to new contracts, SITLA has some flexibility to vary from the fair market value if doing so would be consistent with the balancing of short-term and long-term interests of the state. *Cf. Jeffries v. Hassell*, 197 Ariz. 151, 3 P.3d

1071, 1074 & n. 1 (Ariz.Ct.App.1999) (holding that the Arizona Land Department had not mismanaged Arizona's school trust lands by routinely renewing grazing leases without actively seeking alternative lessees who might pay a higher rental rate because a variety of factors, apart from rental value, were relevant in determining what was in the best interests of the trust).

¶ 23 Accordingly, it is conceivable that SITLA might enter into a long-term ground lease in order to obtain a steady stream of income on land that had a low market value, and equally low rental appeal, at the time of the Lease.[7] While the long-term nature of the Lease gave Cook the comfort to invest the sums necessary to construct the explosives plant on the Property, which it estimates at one million dollars, it also assured SITLA that the Property would generate annual revenue from this remote parcel long before residential communities were established in the area. Indeed, Mr. Cook's correspondence during the early years of the Lease expresses his belief that the rental rate was "highway robbery." While SITLA's agreement to a forty-nine year lease may suggest that it did not anticipate that residential use would become a viable alternative so quickly, this is one of the risks inherent in entering into a long-term lease.

> Long-term commercial leases, by their nature, are risky. Neither side can foretell future market conditions with any certainty. We presume that both [parties] bargained for the best terms and conditions each could get. Each party took the risk that unpredictable market forces would at some later day render the contractual terms unfavorable to themselves. Despite the risk, both parties willingly agreed to the terms in the [L]ease.

*Oakwood Vill. LLC v. Albertsons, Inc.*, 2004 UT 101, ¶ 53, 104 P.3d 1226; *see also id.* ¶ 40

---

**5.** At the time of the trial court's order granting SITLA's motion for summary judgment in March 2009, *Consolidation Coal* was still good law and was relied upon by SITLA in its motion for summary judgment.

**6.** This provision was enacted in 1994, *see* School and Institutional Trust Lands Management Act,

ch. 294, § 6, 1994 Utah Laws 1304, and SITLA has failed to point us to any similar provision existing in 1978 when the Lease was signed.

**7.** Cook suggests that the Property was used primarily for grazing prior to the Lease and only brought in "a few dollars a year."

("'[T]he lessor under a long-term, net ground lease has effectively given up real estate investment in return for what essentially is a fixed-return investment.'" (quoting 5 *Thompson on Real Property* § 44.13(a), at 482 n. 218 (David A. Thomas ed., 1994))).

¶ 24 Furthermore, we see nothing in the language of the other provisions of the School and Institutional Trust Lands Management Act that indicates a legislative intent to negate existing contractual rights, as opposed to setting the requirements for future agreements. The act is prospective, providing for a board of trustees to be formed to establish policies that "shall ... require the return of not less than fair market value" from the lease of school trust lands. Utah Code Ann. § 53C–1–204(1)(b)(iii); *see also id.* § 53C–1–302(1)(b)(iii) (granting the director of the board of trustees broad authority to establish rules and procedures that shall obtain optimum values from the use of school trust lands); *id.* § 53C–4–101 (providing that the director shall establish procedures for determining fair market value of school trust lands). While the act unequivocally states that "[t]rust lands *may not be sold* for less than the fair market value," *id.* § 53C–4–102(1) (emphasis added), there is nothing to suggest that SITLA was empowered to repudiate previously performed contracts of sale. Indeed, the Utah Supreme Court has held that it may not. *See Mathis,* 2009 UT 85, ¶¶ 14, 33, 223 P.3d 1119 (holding that constitutional trust responsibilities did not give SITLA the right to repudiate the completed sale of trust land, and disavowing a prior decision holding that lease of school trust lands at less than full value was null and void). The act's only reference to pre-existing leases, which is in a section dealing with the exchange of trust lands for other land or assets, states, "If trust lands are encumbered by an existing lease, the director may, *with the consent of the lessee,* terminate the existing lease and issue a lease of the same type on lands of comparable acreage or value....

*The state shall honor all vested rights upon acceptance of exchanged lands.*" Utah Code Ann. § 53C–4–301(2) (emphases added). We see nothing in the act that mandates an interpretation of the Lease in favor of SITLA even if such an interpretation would be contrary to the Lease's terms.

¶ 25 Rule R850–30–400(5) of the Utah Administrative Code likewise does not require that the rent be adjusted based on fair market value.[8] This provision, which applies specifically to the adjustment of rental rates in existing special use leases, like the one at issue in this case, provides, "Adjustments in base rentals *may be based upon changes in market value* including appreciation of the subject properties, changes in established indices, *or other methods which may be appropriate and in the best interest of the trust beneficiaries.*" Utah Admin. Code R850–30–400(5)(b) (emphases added). Both the rule's use of the word "may" and its recognition that multiple methods of determining the market value may be appropriate contradict SITLA's assertion that rental adjustments must always be based on the fair market value as determined by the "highest and best use" of the Property. "Even though the lessor might lose money, when compared to the highest and best use valuation, the ... purpose of [a] long term lease or renewal clause [is] to insulate the parties from a change in circumstances as to use, [particularly where] the lessor ha[s] notice of the intended use." *City of Kenai v. Ferguson,* 732 P.2d 184, 188 n. 7 (Alaska 1987) (holding that the correct standard for determining an appropriate renewed rental rate for property leased for construction of a gas station was "the fair market value of equivalently used property" rather than the "highest and best use criterion"); *accord Moolenaar v. Co-Build Cos.,* 354 F.Supp. 980, 984 (V.I.1973) (holding the same with respect to land leased for the purpose of raising sheep and goats); *see also Certain v. Kovens,* 314 So.2d 184, 187 (Fla.Dist.Ct.App.1975) (holding that because "the landlord and tenant together fixed

8. As with the fair market value provision in Utah Code section 53C–1–302(1)(b)(iii), *see supra* note 5, SITLA has failed to point us to an administrative provision existing in 1978 that is similar to the current rule R850–30–400 authorized in 1994 by the School and Institutional Trust Lands Management Act, *see generally* Utah Admin. Code R850–1–100; ch. 294, § 6, 1994 Utah Laws at 1304.

the use of the property," a valuation based on that use was more appropriate than a highest and best use valuation).[9] Moreover, there is evidence that SITLA used valuation methods other than fair market, highest and best use value to adjust rent under existing SITLA leases, including the Lease with Cook. When it adjusted the rent in 1993, SITLA stated that the 1993 rental adjustment was "[b]ased upon the Board-approved index for this type of lease[,] . . . a 16.2% increase for industrial use during this five-year period." Additionally, in the 2005 administrative appeal, the Board concluded that "[i]t was not unreasonable for Cook to believe that [SITLA] might be willing to hold rental due under [the Lease] to a figure near the previous rate." Indeed, the Board observed that SITLA did not follow its purported practice of "using a percentage of the appraised value of the lease property, typically around five to seven percent," to calculate the rental rate adjustment in 1998.

¶ 26 Because neither the Lease, the Utah Constitution, the statute, nor the rule required SITLA to calculate the rental rate based on the fair market value of the Property if used for residential development, we reject SITLA's argument that its imposition of such a fair market value rental adjustment could not have breached the Covenant as a matter of law.

### C. SITLA Was Required to Exercise Its Discretion to Adjust the Rental Rate Under the Lease in Good Faith.

¶ 27 Having concluded that no mandate to use the residential value of the Property as the basis for the rental adjustment prevented application of the Covenant, we now consider the Covenant's effect on the rent escalation clause found in paragraph 11. We agree with SITLA and the trial court that paragraph 11 unambiguously grants SITLA the sole discretion to adjust the rental rate every five years as SITLA deems necessary in the best interest of the State. However, even express contractual rights must be exercised reasonably and in good faith. *See Olympus Hills Shopping Ctr., Ltd. v. Smith's Food & Drug Ctrs., Inc.*, 889 P.2d 445, 450 (Utah Ct.App.1994) (stating that the covenant of good faith and fair dealing requires the reasonable exercise of contractual rights); *see also Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 311 (Utah 1982) (stating that the failure to exercise contractual rights reasonably is a breach of the covenant of good faith and fair dealing). Thus, although contracting parties are free to delegate discretionary authority to one party to make decisions affecting the terms or conditions of the agreement, *see Olympus Hills*, 889 P.2d at 450–51 (acknowledging that a contract may permissibly grant discretionary power to one party), the Covenant serves to protect the other party from an inappropriate exercise of that discretion, *see Oman v. Davis Sch. Dist.*, 2008 UT 70, ¶ 47, 194 P.3d 956 (holding that discretion afforded by contract must be exercised in accordance with the covenant of good faith and fair dealing); *Markham v. Bradley*, 2007 UT App 379, ¶¶ 22, 34, 173 P.3d 865 (holding that discretion afforded to seller to cancel a real estate purchase contract "[i]f the content of the credit report or the [b]uyer [d]isclosures is not acceptable to [the s]eller," must be exercised consistently with the covenant of good faith and fair dealing); *Olympus Hills*, 889 P.2d at 448, 450 (holding that a provision allowing lessee to operate any "lawful retail selling business" must be exercised in good faith so that lessor's justifiable expectations are not denied).

¶ 28 Where the Lease provides no express limits on SITLA's discretion, either

---

9. SITLA cites the cases of *Bullock's, Inc. v. Security–First National Bank of Los Angeles*, 160 Cal. App.2d 277, 325 P.2d 185 (1958), and *Eltinge & Graziadio Development Co. v. Childs*, 49 Cal. App.3d 294, 122 Cal.Rptr. 369 (1975), for the proposition that fair market value should be based on a highest and best use valuation rather than the value of the Property as used. However, in both of these cases the court was tasked with interpreting the meaning of the word "value" in lease provisions that explicitly provided that rent would be a percentage of the value of the property. *See Eltinge*, 122 Cal.Rptr. at 371–72; *Bullock's*, 325 P.2d at 188–89. In the present case, as in *City of Kenai v. Ferguson*, 732 P.2d 184 (Alaska 1987), and *Moolenaar v. Co–Build Cos.*, 354 F.Supp. 980 (V.I.1973), the Lease did not give any direction as to how adjustments in rent should be calculated.

by the inclusion of an agreed formula for calculating rent increases or by some other express standard,

> "[t]he good faith performance doctrine may be said to permit the exercise of discretion for any purpose—including ordinary business purposes—reasonably within the contemplation of the parties. A contract thus would be breached by a failure to perform in good faith if a party uses its discretion for a reason outside the contemplated range-a reason beyond the risks assumed by the party claiming the breach."

*Oman,* 2008 UT 70, ¶ 47, 194 P.3d 956 (quoting *Markham,* 2007 UT App 379, ¶ 34, 173 P.3d 865). The question of whether a party has breached the Covenant is a factual issue that is generally inappropriate for decision as a matter of law. *See id.* ¶ 48; *see also Olympus Hills,* 889 P.2d at 451–52 (holding that because "reasonable minds could differ as to whether Smith's acted in bad faith in changing the use of the leased space" to a warehouse store, summary judgment was properly denied). Thus, SITLA was not entitled to summary judgment unless "reasonable minds could not differ in concluding that [SITLA] did not wrongfully exercise its discretionary power or contractual authority for a reason beyond the risks that [Cook] assumed or for a reason inconsistent with [Cook's] justified expectations." *Oman,* 2008 UT 70, ¶ 48, 194 P.3d 956; *accord Olympus Hills,* 889 P.2d at 451.

■■■ ¶ 29 To determine the "purpose, intentions, and expectations" of the parties, we consider "the contract language and the course of dealings between and conduct of the parties." *Oakwood Vill. LLC v. Albertsons, Inc.,* 2004 UT 101, ¶ 43, 104 P.3d 1226 (internal quotation marks omitted). SITLA contends that the purpose of paragraph 11 was to provide the flexibility to raise rental rates to reflect the current highest and best use, even in the case of exponential increases in property value due to changing use and urbanization. SITLA further contends that the risk of significant adjustment in the rental rate was known to Cook in 1978 when it entered into the Lease, both due to the plain language of the agreement and because Cook

was aware the Property was held in trust pursuant to the Utah Constitution for the benefit of the school trust. In response, Cook argues that SITLA's purpose in transferring responsibility for the Property to its Planning and Development Group; commissioning a development study; attempting to raise the rent from $4,560 to $345,600 per year in 2003; discouraging potential investors; and actually raising the rental obligation to $1,288,690 per year in 2008, 282 times the existing rent of $4,560, was to make it impossible for Cook to remain on the Property and to enjoy the benefits of the Lease. Cook further contends that by engaging in this conduct SITLA acted inconsistently with the expectations created by the course of dealing between the parties during the first twenty-five years of the Lease. In sum, Cook contends that SITLA exercised its discretion under the Lease for a "reason outside the contemplated range—a reason beyond the risks assumed" by Cook. *See Oman,* 2008 UT 70, ¶ 47, 194 P.3d 956. While SITLA argues that nothing it did was motivated by a purpose other than the legitimate desire to maximize the benefit to the trust, we cannot resolve this question as a matter of law. *See id.* ¶ 48 (holding that whether a party has breached the Covenant is an issue of fact that is "generally inappropriate for decision as a matter of law"). Consequently, the trial court erred in granting summary judgment to SITLA on Cook's claim for breach of the Covenant.

II. The Trial Court Correctly Granted SITLA's Summary Judgment Motion on Quiet Enjoyment and Inverse Condemnation.

A. Because There Is No Evidence that Cook Vacated the Premises, Its Quiet Enjoyment Claim Fails.

■■■■ ¶ 30 Cook argues that SITLA breached the implied covenant of quiet enjoyment, making essentially the same arguments as it makes with respect to its good faith and fair dealing claim. However, in Utah, the covenant of quiet enjoyment is synonymous with the covenant of warranty, both of which protect the grantee of a property interest from actual or constructive evic-

tion by someone with superior title. *See Holmes Dev., LLC v. Cook,* 2002 UT 38, ¶¶ 46–48, 48 P.3d 895. A tenant cannot establish constructive eviction unless "both a vacation of the premises by the tenant and a substantial interference by the landlord" occur. *Barton v. MTB Enters.,* 889 P.2d 476, 477 (Utah Ct.App.1995). At the time of the summary judgment motion, Cook was still in possession of the Property. Therefore, Cook cannot establish that SITLA breached the covenant of quiet enjoyment or that it was constructively evicted.

**B. Because SITLA's Actions Do Not Constitute a Taking, Cook's Inverse Condemnation Claim Fails.**

¶ 31 Cook also argues that SITLA's actions constituted a "taking" for which Cook is entitled to compensation. "[A] 'taking' is any substantial interference with private property which destroys or materially lessens its value, or by which the owner's right to its use and enjoyment is in any substantial degree abridged or destroyed." *Colman v. Utah State Land Bd.,* 795 P.2d 622, 626 (Utah 1990) (internal quotation marks omitted). To establish a takings claim, "the claimant must ... show that [its protectible property] interest has been 'taken or damaged' by *government action.*" *Strawberry Elec. Serv. Dist. v. Spanish Fork City,* 918 P.2d 870, 877 (Utah 1996) (emphasis added); *see also* Utah Code Ann. § 63L–3–102 (2008) (defining "constitutional taking" as "a *governmental action* that results in a taking of private property so that compensation to the owner of the property is required by [the United States Constitution or Utah Constitution]" (emphasis added)).

¶ 32 According to the trial court and SITLA, Cook cannot establish governmental action here because Utah Code section 63L–3–102(2)(b)(iv) specifically exempts "school and institutional trust land management activities and disposal of land and interests in land conducted pursuant to Title 53C, Schools and Institutional Trust Lands Management Act" from the definition of "governmental action." *See* Utah Code Ann. § 63L–3–102(2)(b)(iv). The only argument Cook raises in response is that this definition, which was enacted as part of the Private Property Protection Act in 1993, *see* ch. 269, § 2, 1993 Utah Laws 1315 (codified as amended at Utah Code Ann. §§ 63L–3–101 to –202 (2008 & Supp.2010)), does not affect its takings claim because the Lease was signed prior to the statute's enactment. "As a general rule, when adjudicating a dispute we apply the version of the statute that was in effect at the time of the events giving rise to [the] suit." *Harvey v. Cedar Hills City,* 2010 UT 12, ¶ 12, 227 P.3d 256 (alteration in original) (internal quotation marks omitted). Unlike Cook's breach of contract claims, however, its takings claim does not arise out of the 1978 Lease. Rather, the takings claim arises, at the earliest, from SITLA's transfer of responsibility for the Property to the Planning and Development Group in 2000. Thus, the 1993 definition applies and precludes Cook's inverse condemnation claim.

### III. The Trial Court Properly Denied Cook's Summary Judgment Motion.

¶ 33 Cook requests us to order that its summary judgment motion be granted based on the "undisputed" facts argued on appeal.[10] Because we conclude that the trial court did not err in granting SITLA's summary judgment motion with respect to the quiet enjoyment and inverse condemnation claims, the trial court was also correct to deny Cook's

---

**10.** Contrary to Cook's assertion, the facts were not undisputed on summary judgment; rather, SITLA presumed certain facts as stated by Cook only for the purposes of argument on its own summary judgment motion. In considering Cook's motion for summary judgment, we consider those facts in the light most favorable to SITLA. *See State Farm Fire & Cas. Co. v. Sundance Dev. Corp.,* 2003 UT App 367, ¶ 5, 78 P.3d 995 ("When reviewing a grant of summary judgment ... [w]e review the facts ... in the light most favorable to the non-moving party." (alteration in original) (citation and internal quotation marks omitted)). *See generally Wycalis v. Guardian Title of Utah,* 780 P.2d 821, 825 (Utah Ct. App.1989) ("[C]ross-motions [for summary judgment] may be viewed as involving a contention by each movant that no genuine issue of fact exists under the theory it advances, but not as a concession that no dispute remains under the theory advanced by its adversary." (citation omitted)).

summary judgment motion with respect to these issues.

¶ 34 Although we reverse the trial court's grant of summary judgment in favor of SIT-LA as to breach of the Covenant, Cook is not automatically entitled to have its summary judgment motion granted. Our decision today merely holds that whether SITLA breached the Covenant is a factual issue that could not be resolved by summary judgment. *See generally Oman v. Davis Sch. Dist.*, 2008 UT 70, ¶ 48, 194 P.3d 956 ("Whether there has been a breach of good faith and fair dealing is a factual issue, generally inappropriate for decision as a matter of law."). Because "reasonable minds could . . . differ," *see id.*, as to whether the facts of this case establish a breach of the Covenant, neither party is entitled to summary judgment on this issue.

**IV. Cook Must Demonstrate Its Damages.**

¶ 35 On remand, Cook must establish that it has been damaged as an essential element of its breach of contract claim. *See Bair v. Axiom Design, LLC*, 2001 UT 20, ¶ 14, 20 P.3d 388 ("The elements of a prima facie case for breach of contract are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages."). SITLA contends that Cook cannot establish damages, due to its own admissions that the Lehi plant was not operational or profitable. Cook responds that although the Lehi plant was not operating during certain extended periods, it had not been permanently closed. The correspondence attached to the summary judgment memoranda provides some evidence of this trend but also highlights the precarious nature of Cook's Lehi operation. While we agree with SITLA that the evidence on damages is thin, we cannot determine as a matter of law that Cook has suffered no damage.

¶ 36 However, if Cook proves that SITLA breached the Covenant on remand, it must also prove the fact of damage with reasonable certainty, and the amount of damages may not be speculative. *See TruGreen Cos. v. Mower Bros.*, 2008 UT 81, ¶ 15, 199 P.3d 929 ("[W]hile the standard for determining the amount of damages is not so exacting as the standard for proving the fact of damages, there still must be evidence that rises above speculation and provides a reasonable, even though not necessarily precise, estimate of damages." (internal quotation marks omitted)); *Sawyers v. FMA Leasing Co.*, 722 P.2d 773, 774 (Utah 1986) ("The fact of damages must be proven with reasonable certainty and the amount by a reasonable though not necessarily precise estimate.").

¶ 37 Furthermore, even if otherwise successful on remand, Cook is not entitled to damages calculated by a share in the proceeds from the sale of the Property. Cook had no right to purchase the Property; the breach, if any, only affected Cook's remaining leasehold interest. "A tenant who is forced by the landlord's breach of lease to give up the lease incurs compensable damages to the extent that the tenant has to pay more for comparable space over the term of the original lease, plus any special damages." 49 Am.Jur.2d *Landlord & Tenant* § 88 (2006); *see also, e.g., McCone v. Adams*, 239 So.2d 859, 860–61 (Fla.Dist.Ct.App.1970) ("Where a tenant is wrongfully evicted by his landlord . . . [the tenant] may recover as general damages the actual or rental value of the unexpired term less the rent reserved . . . [and] compensation for loss resulting from injury to his business." (internal quotation marks omitted)); *Bergkamp v. Martin*, 114 Idaho 650, 759 P.2d 941, 943 (Idaho Ct.App.1988) ("[A] wrongfully evicted tenant is entitled to recover the fair market value of the remainder of the lease, plus any other losses directly occasioned by the termination." (internal quotation marks omitted)). As in any breach of contract action, Cook would be entitled to general and, if appropriate, consequential damages proximately caused by the breach. *See Cabaness v. Thomas*, 2010 UT 23, ¶ 72, 232 P.3d 486 ("A non-breaching party may recover both general damages, which flow naturally from the breach, and consequential damages, which, while not an invariable result of breach, were reasonably foreseeable by the parties at the time the contract was entered into." (internal quotation marks omitted)).

## CONCLUSION

¶ 38 The express terms of the Lease do not require that rent be adjusted based on the market value of the Property according to its highest and best use, nor is such an adjustment required by law. Where SITLA was given complete discretion to calculate rental rate adjustments, it was constrained by the Covenant to exercise that discretion for a reason within the contemplated range of the risks assumed by Cook. Because reasonable minds could differ as to whether SITLA acted in good faith, we reverse the trial court's decision granting summary judgment to SITLA on Cook's claim for breach of the Covenant.

¶ 39 However, we affirm the trial court's decision granting summary judgment in favor of SITLA on Cook's remaining claims. Because Cook was in possession of the Property at the time summary judgment was granted, it could not prevail on its claim for breach of the covenant of quiet enjoyment. Likewise, Cook failed to show government action, which is an essential requirement of a claim for damages based upon an unconstitutional taking of the leasehold without just compensation.

¶ 40 Finally, we affirm the trial court's denial of Cook's summary judgment motion as to all issues. The trial court correctly denied Cook's motion for summary judgment on the claims for breach of the covenant of quiet enjoyment and for an unconstitutional taking for the same reasons that we affirm summary judgment in favor of SITLA on those claims. In addition, disputed issues of material fact preclude summary judgment on Cook's claim for breach of the covenant of good faith and fair dealing in favor of either party.

¶ 41 Affirmed, in part, and reversed, in part.

¶ 42 I CONCUR: MICHELE M. CHRISTIANSEN, Judge.

¶ 43 I CONCUR, EXCEPT THAT AS TO SECTION IIB, I CONCUR ONLY IN THE RESULT: GREGORY K. ORME, Judge.